**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA

       Plaintiff,

v.                                   No. CR 05-924 RB

LARRY LUJAN,

       Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

On April 30, 2008, Defendant Larry Lujan ("Defendant") filed a Motion to Suppress his

Statements to Law Enforcement and Incorporated Memorandum (Doc. 284).  Defendant seeks to

suppress any statements he made on May 28, 2005, to investigators on the basis that his statements

were involuntary because the environment was inherently coercive.  I held a hearing on this motion

on June 10, 2008.  Having considered the parties' briefs, the arguments of counsel, the relevant case

law, and the evidence presented at the hearing, I find that the motion is not well-taken and will deny

the motion.

**I.**      **FACTUAL FINDINGS**

On May 27, 2005, at approximately 5:00 p.m., Deputy Marshal Bobby Hogeland arrested

Defendant pursuant to a federal arrest warrant.  He transported Defendant to a federal facility.  At

around 5:30 p.m., in the parking lot of the federal facility, Deputy Marshal Hogeland advised

Defendant of his *Miranda* rights,[1] although he did not ask him any questions at that time.  Defendant

---

[1]*Miranda* warnings include the right to remain silent, that any statement made may be
used as evidence against him, and that he has the right to an attorney.  *See Miranda v. Arizona*,
384 U.S. 436, 444 (1966).

was booked and left in the facility overnight.

On May 28, 2005, Deputy Marshal Bobby Hogeland transported Defendant across the street to an interview room in the San Antonio Police Department ("SAPD"). The room was approximately 10 feet by 8 feet with a desk and three chairs. Defendant was handcuffed during the interview. Detective John Ordonez and Sergeant Mark Perea of the Doña Ana County Sheriff's Office entered the interview room at approximately 7:50 p.m. for the purpose of trying to extract a confession from Defendant.

They began by introducing themselves and asked him a few preliminary background questions. *See* Hr'g Ex. 1 at 00529-31.[2] Within three minutes, Detective Ordonez advised Defendant of his *Miranda* rights and asked Defendant if he understood each of his rights. Defendant stated that he did. *See id.* at 0000631-32. Detective Ordonez then had Defendant read aloud a form waiving his rights. *See id.* at 0000632. Defendant signed the form and told the officers that he wanted to talk to them. *See id.*; Hr'g Ex. 3. Detective Ordonez did not observe any signs that Defendant was intoxicated, under the influence of drugs, suffering from withdrawals or that he had any other disability. Defendant was coherent and appeared to understand the officers' questions throughout the interview.

After some initial "rapport-building questions," *see* Hr'g Ex. 1 at 0000632-47, the officers told Defendant they were investigating Dana Grauke's murder and that they had reason to believe he had information about the homicide, *see id.* at 0000647. The officers proceeded to ask Defendant

---

[2]Hearing Exhibit 1 contains two transcripts of the May 28, 2005 interview. For ease of reference, I will cite to the bates numbers of the transcripts. I quoted the transcripts verbatim, so any spelling and grammatical errors contained within the quotations are due to errors in the original transcription.

questions concerning the homicide. *See id.* The tone during the interview was conversational, easygoing, and non-threatening. Defendant often laughed and smiled during the interview. *See* Hr'g Ex. 2. He did not answer many pointed questions, claimed he did not remember many events asked in other questions, and a few times refused to give the officers some of the names of his friends and acquaintances. *See*, *e.g.*, Hr'g Ex. 1 at 0000663-65.

About an hour into the interview, the officers gave him a Dr. Pepper and water. *See* Hr'g Ex. 2. The officers told him a few times that he could only help himself by talking to them. Defendant answered that he did not know and did not remember. *See* Hr'g Ex. 1 at 0000662-64. They also told him a couple times that this was his chance to clear his name, but Defendant again said he did not know what they wanted. *See id.* at 0000665. The officers repeatedly asked him if he killed Dana Grauke, and Defendant repeatedly denied killing him. Sergeant Perea told him that once they left for New Mexico, they could not help him after that, and that they would bring his family in to testify against him. *See id.* at 0000689. Sergeant Perea then said, "you've been respectful to us and I hope you think that we've been respectful to you." Defendant agreed saying, "Yeah." *Id.* at 0000690. At around 10:21 p.m., Defendant was allowed to use the restroom. The interview resumed three minutes later. *See* Hr'g Ex. 2. During this second portion of the interview, Sergeant Perea informed Defendant that he was going to be charged federally for kidnaping and murder, that he would stay in jail until trial, and that his mother, sister, and ex-girlfriend, Corina, would be brought in, and that he should help his family out and not drag them through court. *See* Hr'g Ex. 1 at 0000692-93. Despite the severity of the charges discussed, the tone was still conversational. *See* Hr'g Ex. 2.

A few minutes later, the officers pointed out that he was looking at a lot of time if he did not

3

help himself out, that he was facing the death penalty, which is the maximum at the federal level for homicide kidnaping, with minimum of life in prison without parole.  *See* Hr'g Ex. 1 at 0000697. They told him that they had enough to lock him up to where he would never get out.  *Id.*  Defendant nonetheless repeatedly denied killing Dana Grauke.  *See id.* at 0000697-98.

A short time later, when Defendant asked, if he did say something, how would that help him, the officers responded:

> Q:    Death penalty versus life in prison. . . . That is definitely helping yourself. 30 years max that's helping yourself compared to life in prison without parole, you'll never see the end of day.  You'll never come out again Larry. . . . We know that you were in New Mexico.
>
> A:    Not at that time.
>
> Q:    Yes you were.
>
> A:    All right.
>
> Q:    Larry, yes you were?
>
> A:    Okay.
>
> Q:    We got the motel receipt?
>
> A:    Okay.
>
> Q:    We got receipts from the motel.  We got receipts where you guys purchased bottle of pop that was left in Mary Ann's Jeep, the receipts on in there.  The dates are on there, Larry.  Somebody left their cell phone charger in the glove box, we got that.  If I was a betting man I would say that you would prefer to help yourself instead of take the full brunt.
>
> A:    They are going to find me guilty either way.
>
> Q:    Larry, we're not trying to find you guilty, we're not.  We're trying to find out why?  Why?
>
> A:    I'll tell you if I knew.

4

Q:      You do know Larry?

A:      I don't sir. . . .

*Id.* at 0000698-99.

A few minutes later, the following exchange occurred:

Q:      Why?  As compared to a jury saying death penalty, life in prison without
        parole because he helped himself out and that's what you're facing because
        he stood out and said, "You know what I don't want to put my family
        through this."

A:      If I cough up to this they give me life and either way if I don't you'll give me
        death penalty.  So if I say no I'd die anyway and if I say yes I'm going to live
        the rest of my life in prison.  That's what I said right if would take the blame
        I'll get life that means the rest of my life in prison.

Q:      All we're telling you is that the federal level because Grauke was kidnapped
        from his home and taken across the state line the maximum penalty is death.
        The maximum penalty is death.  We're not saying that you're going to get
        that.  The minimum is life in prison without parole that's the minimum, you
        help yourself out you know how the system goes Larry, you've been arrested
        before, and you know how this works.  We can't promise you the world we
        can't promise you that this is going to happen but I guarantee you nine times
        out of ten when somebody is facing charges they help themselves out they
        work with them.  They do work with them.

A:      I'm telling you it wasn't me though.

*Id.* at 0000701.  Defendant repeated that it was not him.  *Id.*

Later in the interview the following discussion took place:

Q:      They're going to go after your sister for providing the Jeep, they're not going
        to stop, they are not going to stop at you.  They're not going to blame them.
        You don't leave us a whole lot of choice.

A:      Who's going to after my sister?

Q:      You go ask her?

A:      After the Jeep?

5

Q:      Not after the Jeep.  We'll go after her for assisting you for this whole thing.
        I'm telling you everything finishes here, just face up to what you did.
        Nobody else has to be put through anything. . . . This is the first time you
        mentioned that it could have been somebody else and you know what the
        truth is if it would have been somebody else, you would of said it right away.

A:      No, I didn't know you were going to take all my family to Cruces to go
        fucken testify, you know what I mean.

Q:      They're going to, Larry. . . . You have to.  It's not that you can't, it's that you
        have to.  They go after you for everything and they bring all your family in
        to testify . . .

A:      I'm going to lose anyways.

Q:      That's up to you. . . . Larry, I might have made a mistake a little while ago
        when I was explaining something to you and I've been corrected.  In the
        federal level if you're convicted the maximum is death penalty, if it's a
        capital murder case.  If your convicted the minimum is life in prison without
        parole, if your convicted if the jury convicts you.  Do you understand that?

A:      No, say it again.

Q:      If you go to trial, if we take you to trial and the jury finds you guilty and your
        convicted those are the two things that you'll get.

A:      And if I don't.

Q:      If you help yourself out and you don't go to trial it's less.  I just been
        corrected by that, I don't know how less but I've been corrected and I
        apologize that was my mistake.

*Id.* at 0000708.

        Despite this exchange, Defendant continued to assert that he did not do it.  *See id.* at

0000709.  The officers a short while later again emphasized that he had a choice to make:

A:      Life or death.

Q:      It's still a choice.

A:      I think I rather take the death then the rest of my life in prison.

6

Q:      It's a wrong choice to make?

A:      I don't know sir.  No parole either way if I say anything either way I'm gone for real, right?

Q:      If your convicted and you go to trial and they bring everybody (Inaudible interference).  If you don't testify in front of everybody you tell us what you did and it's totally different completely different.  It doesn't go that far it doesn't have a death penalty; it doesn't have life without parole.

A:      What does it have?

Q:      We don't know.  Your family is going to testify that's for sure.

A:      For me is maximum for one thing.

Q:      I don't know I don't deal with federal issues, Larry.  I really don't I wouldn't know where to begin telling you.  I'd be lying to you if I told you a figure. All I know is that I've been corrected and if your not convicted by a jury and you take responsibility for what you did it's less time, I don't know how much.

A:      What if they charge me for everything?

Q:      If you're convicted by a jury you're going to pay.  So you do have choices to make don't say that you don't have a choice to make.  Do I want to drag my family through all of this I don't think so.

*Id.* at 0000710-11.

Defendant repeated afterwards that he did not know how Dana Grauke died.  *See id.* at 0000711.  When asked if he was at the Quintanas' during the fiesta time period, Defendant said he did not remember, but then immediately admitted that he was there after the officer told him that he just finished telling them that her food was good.  *Id.* at 0000712.  Defendant also admitted, when asked, that he was at the Super 8 motel room and that Corina wired him money.  *Id.*  Although admitting these few details, Defendant denied leaving with Dana Grauke in the Jeep.  *Id.* at 0000713. When Sergeant Perea said that they are going to fine him the max, when he could have admitted

7

what he did and gotten something different, Defendant responded, "I didn't do nothing, sir.  I'm telling you."  *Id.* at 0000715.

At 11:20 p.m., Officers Ordonez and Perea took a second break in questioning, during which time Defendant ate a piece of pizza.  *See* Hr'g Ex. 2.  A few minutes later, Deputy Marshals Hogeland and Pete Acosta came in and spoke to Defendant until 12:24 a.m.  The tone remained conversational and non-adversarial.  Defendant was cordial, never disrespectful, and would joke around at times.

During this part of the interview, Deputy Marshal Hogeland explained to Defendant how the federal system worked from indictment through trial.  *See* Hr'g Ex. 1 at 00534-37.  He told Defendant that if you make a deal, you look at less time, but he emphasized that nobody could tell him what he would get if he pled because that decision is only up to the judge.  *See id.* at 00538-39. He explained the sentencing guidelines generally and noted that, when a defendant accepts responsibility and pleas, he will usually get less time.  *See id.*  Defendant responded that he could not do that because his family was out there and he knew what happened with snitches.  *See id.* at 00540.  Deputy Marshal Hogeland spoke about how Defendant used his sister's Jeep; that if he goes to trial, the government is going to bring his sister in to testify; and he asked Defendant why he is going to put her through being on the stand when all she did was love him. *See id.* at 00541-42.

Later, Deputy Marshal Hogeland discussed how, even though he had a chance of getting a lot of time, Defendant would breathe better if he confessed and got it off his chest.  *See id.* at 00548. After a few minutes of additional questioning, Deputy Marshal Hogeland discussed potential testimony of witnesses who saw Dana Grauke bound and gagged in his Jeep and advised that Defendant needed to start thinking like a business man.  *See id.* at 00555-56.  Defendant responded,

8

"Can't think right now." *Id.* at 00556. He repeated, however, that he "didn't kill him." *Id.* When discussing a potential sentence if he were found guilty, Defendant said, "death penalty." *Id.* at 00557. Deputy Marshal Hogeland responded, "Maybe." *Id.* He then told Defendant that if he is found guilty, it is because he probably did it, and he listed evidence the prosecutors had to use against him. *See id.*

He also informed Defendant that, if he gets sentenced, the judge can recommend to the Bureau of Prisons ("BOP") certain jail facilities to benefit him. *See id.* at 00558-59. Deputy Marshal Hogeland was careful to add, however, that it "doesn't mean that they, B-O-P, has to do it, but it's nice to know that a judge has recommended it. Cause most of the time . . . [t]hey want to keep the judge happy." *Id.* at 00559. He asked Defendant if he gets shipped off to Minnesota, how often are his boys going to drive there to visit him. *See id.* At the end of the conversation, he urged Defendant to talk to the other officers and help them out. Defendant responded that he already told them he could not but that it was fine if they talked to him one more time. *See id.* at 00574.

At 12:23 a.m., Defendant asked for some more water, so Sergeant Perea brought him another bottle of water. *See* Hr'g Ex. 2. Detective Ordonez and Sergeant Perea then took over questioning again. Sergeant Perea asked Defendant if he was alright. Hr'g Ex. 1 at 00574. Defendant said, "Yep, alright." *Id.* Sergeant Perea then asked what he was going to do. *Id.* Defendant repeatedly replied that he did not know what to tell them, that he did not do it, that he did not want to be a snitch, that he could not tell them anything, and that he did not know anything. *See id.* at 00574-78. When Sergeant Perea asked him if he would like to be in Anthony, New Mexico, Defendant replied that Deputy Marshal Hogeland told him that if he helped the government, they would consider him and recommend that he be incarcerated closer to his family. *See id.* at 00581. Sergeant Perea asked

9

if it interested him, to which Defendant responded, "It does, but. . . ."  *Id.*  Defendant would not tell

them anything, and they said they could not force him to talk.  *See id.* at 00582-86.  After a few

minutes of additional questioning, they completed the interview at 12:45 a.m.

The entire interview lasted approximately five hours.  At no point during the interview did

Defendant request an attorney or indicate that he no longer wanted to speak to the investigators.  At

no point were there more than three people in the room including Defendant.  Defendant stayed

strong throughout the interview and repeatedly did not waiver from his position that he did not

murder Dana Grauke.

## II.   DISCUSSION

The Fifth Amendment states: "No person . . . shall be compelled in any criminal case to be

a witness against himself."  U.S. Const., amend. V.  Relying on the Fifth Amendment, the Supreme

Court has held that if police take a suspect into custody and interrogate him, they must inform him

of his *Miranda* rights, or his responses cannot be introduced into evidence at trial to establish his

guilt.  *See Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).  A statement may be deemed involuntary

even if a suspect has been given his *Miranda* rights and properly waived them.  *See United States*

*v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006).  "But cases in which a defendant can make a

colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law

enforcement authorities adhered to the dictates of Miranda are rare."  *Berkemer*, 468 U.S. at 433

n.20.  The government bears the burden of showing by a preponderance of the evidence that the

confession is voluntary.  *Lopez*, 437 F.3d at 1063.

The test of voluntariness is based on the totality of the circumstances, considering both the

characteristics of the defendant and the details of the interrogation.  *Schneckloth v. Bustamonte*, 412

U.S. 218, 227 (1976); *Lopez*, 437 F.3d at 1063.  The court must determine whether the defendant's confession is the product of an essentially free and unconstrained choice or if his will was overborne by physical or psychological coercion, threats, or by improper inducement.  *See Lopez*, 437 F.3d at 1063; *United States v. Erving L.*, 147 F.3d 1240, 1248-49 (10th Cir. 1998).  A confession is only involuntary if the police use coercive activity to undermine the suspect's ability to exercise free will. *Erving L.*, 147 F.3d at 1249.

No single factor is determinative in the voluntariness inquiry.  *Lopez*, 437 F.3d at 1063. Relevant factors include (1) the suspect's age, education, and intelligence; (2) whether the suspect has been arrested and given *Miranda* warnings on earlier occasions, indicating previous experience with the criminal justice system; (3) the length of the detention and questioning; (4) the nature of the detention and questioning, such as whether threats or promises of leniency were made; (5) any advice of a suspect's constitutional rights; (6) the use of physical punishment; and (7) whether the suspect confessed to the crime or consistently denied any involvement in the crimes throughout the interview.  *See Schneckloth*, 412 U.S. at 226; *Lopez*, 437 F.3d at 1063-65; *United States v. Chalan*, 812 F.2d 1302, 1307-08 (10th Cir. 1987).  The Tenth Circuit found this latter fact particularly important in concluding that a suspect's free will was not overborne in questioning.  *See Chalan*, 812 F.2d at 1308 ("Finally, and *most importantly*, Chalan consistently denied any involvement in the crimes throughout the January 29th interview.  We believe this fact *in particular* indicates that Chalan's free will was not overborne by the questioning.") (emphasis added).  As for the nature of the questioning, promises of leniency are relevant in determining whether a confession was involuntary.  *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997).  The court must initially determine whether a promise of leniency was made to the defendant or if the defendant reasonably

11

believed that such a promise had been made.  *See United States v. Garot*, 801 F.2d 1241, 1244-45 (10th Cir. 1986).  If so, the court must determine whether the inducing promise was coercive – whether the accused was so gripped by a hope of leniency that he did not or could not freely and rationally choose among available courses of action.  *See Garot*, 801 F.2d at 1245.  A suspect's personal characteristics are only relevant if the court first concludes that the officer's conduct was coercive.  *Lopez*, 437 F.3d at 1064.

In this case, although the length of the questioning at five hours was relatively long, Defendant did not appear fatigued and he was given a restroom break, food, and drinks.  The questioning was conducted after Defendant's arrest at the police station, and he was handcuffed throughout the interview; nevertheless, the overall tenor of the interrogation was conversational. Throughout much of the interview, Defendant was leaning back, slouched in the chair, and did not appear uncomfortable.  Only two interrogators were in the room questioning Defendant at a time. At times, Defendant laughed at the interrogators' jokes and told anecdotes, and at other times they discussed things like NBA basketball and the Defendant's kids.  No physical force was used against Defendant during the interview.  Furthermore, the fact that Defendant was given his *Miranda* warnings, waived them, and gave no indication to the interrogators during the interview that he wanted to stop talking to them weighs in favor of finding his statements voluntary.

Weighing in favor of finding the statements involuntary, however, are statements made by Officers Ordonez and Perea that could be construed as threats.  Although the interrogators repeatedly stated that Defendant, by not cooperating, would force his family to take the stand at trial, this line of questioning does not seem inherently coercive, as family members frequently have to testify at trial.  In contrast, however, the following statement could reasonably be construed as

threatening:  "They're going to go after your sister for providing the Jeep, they're not going to

stop. . . . We'll go after her for assisting you for this whole thing."  Hr'g Ex. 1 at 0000708.

Moreover, the officers indicated that Defendant would receive leniency if he cooperated.

Although it was permissible for the officers to accurately inform Defendant of the maximum and

minimum sentence for the charges he faced, they did not stop at merely informing him of the

severity of the crime.  They suggested to Defendant that, by helping them, he could get 30 years

maximum, instead of life without parole.  Later in the interview, Officer Perea repeated, "If you help

yourself out and you don't go to trial it's less.  I just been corrected by that, I don't know how less

but I've been corrected."  *Id.* at 0000708.  The officers later clarified that they could not give

Defendant a concrete term of years he would face: "I really don't I wouldn't know where to begin

telling you.  I'd be lying to you if I told you a figure.  All I know is that I've been corrected and if

your [sic] not convicted by a jury and you take responsibility for what you did it's less time, I don't

know how much."  *Id.* at 0000710-11.  The officers' statements could reasonably be interpreted as

conveying that Defendant would get less than life in prison without parole if he confessed or

cooperated.  These statements thus may cross the line from limited assurances towards promises of

leniency.  *Compare Lopez*, 437 F.3d at 1064-66 (concluding there was no clear error in finding that

pieces of paper marked "mistake," "murder," "6," and "60" was promise of leniency and holding

that defendant's confession was involuntary where agents promised him he would spend six rather

than 60 years in prison if he admitted to killing victim by mistake and agents misrepresented

strength of evidence against him); *Clanton*, 129 F.3d at 1158-59 (stating that agent's statement to

suspect that he would get 25-year sentence if he did not confess, but would get off lightly if he

confessed, raised question of fact as to whether confession was voluntary); *with United States v.*

13

*Nguyen*, 155 F.3d 1219, 1223 (10th Cir. 1998) (statement to inform prosecutor of defendant's cooperation without any other indications of coercion does not constitute promise of leniency); *United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994) (limited assurance that officer promised to make suspect's cooperation known to United States Attorney's Office and that he himself could make no deals with suspect, did not taint statements as involuntary); *Garot*, 801 F.2d at 1243-45 (holding that there was no promise of leniency, even where agent told defendant that she could be in "big trouble," and that if she were to tell the truth about what occurred, he would relay the information to the prosecutor).

Deputy Marshal Hogeland also discussed other benefits that Defendant might receive if he confessed -- a decrease in levels for acceptance of responsibility as to his sentence and a recommendation from the judge that he be incarcerated in a prison near his home.  Deputy Marshal Hogeland, however, was careful many times to clarify that nobody could guarantee these benefits, because they would be up to the judge.  As evidenced by the following exchange, Defendant appears to have understood the limitations of these latter assurances:

| | |
|---|---|
| Bobby: | If it were me, you know what I'd be telling them?  Look, I want to talk to you but, can you try to keep me near my kids? . . . |
| Larry: | But there won't be a guarantee, right? |
| Bobby: | You got to understand, when you're talking guarantees you're talking judges. |
| Larry: | Yeah, O.K. |

*See* Hr'g Ex. 1 at 00567.  Defendant also indicated that he understood that there was no promise of a particular location for incarceration when, in conveying to Sergeant Perea what Deputy Marshal Hogeland informed him about leniency, Defendant explained that the government would "consider"

14

him and "would recommend" that he be imprisoned close to his family.  *See id.* at 00581.  I therefore find that these latter discussions of benefits constitute limited assurances, rather than promises of leniency.

Although the questioning could reasonably be construed as containing a threat and a few promises of leniency, the nature of the questioning is only one factor in the totality of the circumstances analysis.  Had Defendant confessed shortly after the threat or assurances of leniency been made, then his confession might reasonably be deemed coerced.  Although he did admit to certain facts, such as being in New Mexico and at the Quintanas' house, he did so only after Detective Ordonez and Sergeant Perea had pointed out all the evidence that they possessed that he had been there and the fact he had previously admitted to being in New Mexico earlier in the interview.[3]  Immediately after admitting these few facts, though, he denied knowing anything about the murder.  Significantly, throughout the interview, Defendant consistently denied committing the murder and repeatedly told interrogators that he could not and would not cooperate with them, indicating that he never was so gripped by fear or the hope of leniency that he did not or could not freely and rationally choose among available courses of action.  Defendant stayed strong and consistently refused to waiver from his position.  The fact that Defendant did not confess to Dana Grauke's murder demonstrates that Defendant exercised free will when making his statements during the interview and that whatever promises or threats were made were not unconstitutionally coercive.  *Cf. Chalan*, 812 F.2d at 1308 (concluding that statements were not involuntary where,

---

[3]Defendant, when faced with the evidence the officers had indicating he was in New Mexico, admitted to being in New Mexico during the first portion of the interview, before the officers told him the federal charges he was facing and discussed any potential sentences.  *See* Hr'g Ex. 1 at 0000683-84.

although all those present exhorted him to tell truth, suspect was specifically informed at beginning of interview that he was not obligated to answer questions; interview was only 1 ½ hours; suspect's mother was present; no one physically threatened him; he had experience with law enforcement procedures; and he consistently denied involvement in crimes throughout interview).

Finally, as to his personal characteristics, Defendant was 26 years old at the time of the interview, he had a GED, and appeared intelligent.  *See* Hr'g Ex. 1 at 0000631, 0000634; Hr'g Ex. 2.  He had previously been arrested, indicating experience with the criminal justice system.  *See* Hr'g Ex. 1 at 0000644-45.

In sum, the lack of any confession by Defendant, indicating as it does that his will was not overborne, is a dominating factor in the "totality of circumstances" analysis.  Accordingly, Defendant Lujan's statements to law enforcement on May 28, 2005 were voluntary.  *Cf. United States v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002) (holding that suspect's statement was voluntary, even though law enforcement accurately brought to his attention possible 10 to 20-year sentence for crime and agent told him that he would let government know if he cooperated and that cooperation could help him avoid lengthy sentence, because totality of circumstances indicated his will was not overborne); *Chalan*, 812 F.2d at 1308.

**IT IS THEREFORE ORDERED** that Defendant Lujan's Motion to Suppress his Statements to Law Enforcement and Incorporated Memorandum (Doc. 284) is **DENIED**.

_____
UNITED STATES DISTRICT JUDGE