# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 05-0924 RB |
| | ) | |
| LARRY LUJAN, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u><br><u>AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS</u><br><u>EVIDENCE OF DISCIPLINARY ACTIONS AND ALLEGATIONS</u>

**THIS MATTER** is before the Court on Defendant's (Mr. Lujan's) Motion to Suppress

Evidence of Disciplinary Actions and Allegations (Doc. 277), filed on April 30, 2008.  The Court

held an evidentiary hearing on this motion on November 18, 2008.  Counsel submitted proposed

findings of fact and conclusions of law on March 9, 2009, and November 19, 2010.  Having

considered the submissions of counsel, record, relevant law, and being otherwise fully advised, I

issue these findings of fact and conclusions of law and deny this motion.

## FINDINGS OF FACT

1.      Mr. Lujan is charged with Kidnapping Resulting in Death of Dana Joe Grauke II,

and aiding and abetting, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 2.  (Doc. 145).

The Third Superseding Indictment included a Notice of Special Findings against Mr. Lujan,

pursuant to the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3598.  (Doc. 145).  On

July 12, 2007, and February 17, 2011, the United States filed Notices of Intent to Seek a

Sentence of Death, pursuant to the requirements of 18 U.S.C. § 3593(a) of the FDPA.  (Doc. 146

and Doc. 690).  In the Notice of Intent to Seek a Sentence of Death of February 17, 2011, the

United States provided notice that it intends to rely on future dangerousness and victim impact evidence as non-statutory aggravating factors.  (Doc. 690).

2.     More specifically, to prove future dangerousness during the penalty phase of trial, the United States intends to rely on evidence of (1) a continuing pattern of violence, (2) low rehabilitative potential, (3) lack of remorse, and (4) gang participation.  (Doc. 690).  With regard to low rehabilitative potential, the Notice of Intent to Seek a Sentence of Death states "Larry Lujan has demonstrated a low potential for rehabilitation as evidenced by his repeated acts of institutional misconduct while in the custody of various state and local correction or detention agencies, or the United States Marshals Service."  (Doc. 690 at 4).

3.     In his Motion to Suppress Evidence of Disciplinary Actions and Allegations, Mr. Lujan requested exclusion of eight disciplinary incidents that occurred while Mr. Lujan was detained at the Doña Ana County Detention Center (DACDC).  (Doc. 277).  The eight disciplinary incidents as listed by Mr. Lujan are as follows:

    a.     Participating in the assault and battery of another detainee in August 2007 (Miguel Garcia incident on August 3, 2007);

    b.     Entering areas where he was not authorized to go in August 2007 (excluded from United States' Informative Outline);

    c.     Modifying a toothbrush into a purported handcuff key in October 2006 (found during cell search on October 6, 2006);

    d.     Concealing modified finger nail clippers for use as a weapon in September 2006 (found during cell search on October 6, 2006);

    e.     Fighting with another detainee and refusing orders to separate in September 2006 (Eddie Jerome Hogges incident on September 14, 2006);

    f.     Fighting with another detainee in May 2006 (Jose Trejo-Alvarado incident on May 8, 2006);

g.      Participating in the assault and battery of another detainee in February 2006 (Nibardo Ponce incident on February 11, 2006);

h.      Entering areas where he was not authorized to go and threatening another detainee in November 2006 (excluded from United States' Informative Outline).

(Doc. 277 and Doc. 437).

4.      In its Informative Outline Regarding Evidence in Support of Statutory Threshold Findings, Statutory Aggravating Factors, and Non-Statutory Aggravating Factors, filed on October 6, 2008, the United States did not include the incidents from August 2007, and November 2006, as described by Mr. Lujan. (Doc. 437). Additionally, the nail clippers and the purported handcuff key were found during the same search of Mr. Lujan's cell on October 6, 2006. (Doc. 437). Thus, there are five, rather than eight, disciplinary incidents at issue. The five incidents are, in chronological order:

a.      Participating in the assault and battery on Nibardo Ponce on February 11, 2006;

b.      Fighting with Jose Trejo-Alvarado on May 8, 2006;

c.      Fighting with and refusing to separate from Eddie Jerome Hogges on September 14, 2006;

d.      Possession of the purported handcuff key and modified nail clippers found during the cell search on October 6, 2006; and

e.      Participating in the assault and battery of Miguel Garcia on August 3, 2007.

5.      As grounds for suppression of all evidence of these incidents, Mr. Lujan contends that: (1) the evidence is unreliable and not supported by due process; (2) that use of the disciplinary reports should be excluded pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004); and (3) the probative value of the evidence is outweighed by the danger of unfair prejudice.

3

(Doc. 277).

6.      On November 18, 2008, the Court held an evidentiary hearing on Mr. Lujan's Motion to Suppress Evidence of Disciplinary Actions and Allegations.  (Doc. 516).  The Court heard the testimony of the following five witnesses, all of whom were employed, or had been employed, at the DACDC: (1) Lloyd Burns; (2) Patrick Howie; (3) Meliquiades Reyes; (4) Justin Porter; and (5) Benjamin Mendoza. (Doc. 516; Doc. 529).  The Court admitted, as Government Exhibits 1 and 2, the DACDC Operations Manual, Revised, May 1, 2007; and Inmate Classification for Mr. Lujan; and as Defendant's Exhibits A-K, DACDC Inmate Disciplinary Reports dated March 28, 2008; October 11, 2007; October 13, 2006; September 19, 2006; May 10, 2006; February 14, 2006; and November 7, 2005; the DACDC Operations Manual, Revised, August 5, 2008; DACDC Policy and Procedure, Revised, March 12, 1997; the DACDC Adult Detainee Handbook, Revised, June 1, 2005; and the DACDC Adult Detainee Handbook (Smaller Copy), Revised, June 1, 2005.  (Doc. 516; Doc. 529).

7.      Mr. Lujan was a pretrial detainee at the DACDC at all relevant times.

8.      The DACDC Adult Detainee Handbook sets out the rules and potential sanctions that may be imposed if an inmate violates a rule.  (Transcript of Nov. 18, 2008 (hereinafter Tr.), 108).  Mr. Lujan received copies of the Detainee Handbook on June 30, 2005, December 22, 2005, and on February 14, 2006.  (Tr. 178).

9.      The DACDC Operations Manual governs policies on inmate discipline.  (Govt. Ex. 1; Tr. 106).  These policies are based on the standards of the American Corrections Association.  (Tr. 125-26; 131).  The policies define three different classifications of violations. (Tr. 106-07).  A minor violation is handled at the officer level while moderate and major violations proceed through a hearing.  (Tr. 106-07).  Disciplinary hearings are administrative

4

proceedings and findings are determined by a preponderance of the evidence.  (Tr. 109; Govt.

Ex. 1).  If the incident is sufficiently severe, a detainee may be placed in pre-disciplinary lock

down.  (Tr. 82).

       10.     The policies require officers involved in an incident to write reports and deliver

the reports to the Classification Department.  (Tr. 83).  A Classification Officer reviews the

reports and prepares a disciplinary file.  (Tr. 83).  The Classification Officer meets with the

detainee and advises the inmate of the disciplinary charges.  (Tr. 83).  The inmate may indicate

on an advisement form (1) whether the inmate wants a staff advocate, (2) whether the inmate

wants to appear at the hearing, (3) whether the inmate wants to call witnesses, (4) whether the

inmate wants to submit a written statement, and (5) whether the inmate wants to plead either

guilty or not guilty.  (Tr. 83). A staff advocate explains the charges and possible consequences.

(Tr. 85-86).

       11.     Disciplinary hearings are held before a hearing officer within seven days of the

incident.  (Tr. 86).  Disciplinary hearings consist of a meeting between the inmate and the

hearing officer.  (Tr. 86).  The hearing officer reviews the reports filed by the officers involved,

and listens to the inmate's explanation of the events.  (Tr. 86).  The hearing officer may interview

witnesses identified by the inmate.  (Tr. 93).  In the disciplinary actions involving Mr. Lujan, the

hearing officers reviewed reports of each incident, but did not interview the officers who

prepared the reports.  (Tr. 89, 92-94, 101, and 197-198).  An inmate has three days to appeal.

(Def. Ex. B.)

       12.     On February 11, 2006, Mr. Lujan assaulted Nibardo Ponce.  (Def. Ex. F).  Mr.

Ponce suffered injuries to his forehead, the bridge of his nose, and his back.  (Def. Ex. F). On

February 14, 2006, Mr. Lujan received an Advisement of Pending Disciplinary Charges that

accused him of assault or battery without a weapon on another person.  (Def. Ex. F).  On February 14, 2006, Lieutenant Duncan Blackburn held the disciplinary hearing. (Def. Ex. F). Mr. Lujan appeared at the disciplinary hearing, but waived representation by a staff advocate and declined to submit a written statement or to present witnesses or statements in support of his defense.  (Def. Ex. F).  While the record does contain the finding of the hearing officer as to the outcome of the hearing, (Def. Ex. F), counsel for Mr. Lujan stated, at the hearing of November 19, 2008, on a motion in limine (Doc. 456), that Mr. Lujan was found by the hearing officer to have been one of the individuals involved in this assault.  (Transcript of Nov. 19, 2008, 26-27).

13.     On May 8, 2006, Mr. Lujan was involved in an altercation with Jose Trejo-Alvarado.  (Def. Ex. E).  On May 9, 2006, Mr. Lujan received an Advisement of Pending Disciplinary Charges charging him with: (1) assault or battery without a weapon on another person; (2) threatening another person; and (3) any act not listed above that would be a misdemeanor under New Mexico or United States law.  (Def. Ex. E).

14.     On May 10, 2006, Lieutenant Peña held the disciplinary hearing.  (Def. Ex. E). Mr. Lujan appeared at the disciplinary hearing, but waived representation by a staff advocate and declined to submit a written statement or to present witnesses or statements.  (Def. Ex. E).  At the conclusion of the hearing, Mr. Lujan was found guilty of assault or battery without a weapon on another person.  (Def. Ex. E).  Mr. Lujan was sentenced to seven days in lockdown.  (Def. Ex. E).

15.     On September 14, 2006, Mr. Lujan assaulted inmate Eddie Jerome Hogges with a soap-filled sock.  (Def. Ex. D).  On September 19, 2006, Mr. Lujan received an Advisement of Pending Disciplinary Charges accusing him of assault or battery with a weapon on another person.  (Def. Ex. D).  On September 21, 2006, Lieutenant Mendoza held a disciplinary hearing

6

at which Mr. Lujan appeared.  (Def. Exh. D).  Mr. Lujan elected not to be represented by a staff

advocate and chose not to submit a written statement or have witnesses in support of his defense.

(Def. Exh. D).  Mr. Lujan admitted to the charges, was found guilty, and sentenced to eighteen

days lockdown and loss of privileges.  (Def. Ex. D).

       16.     On October 6, 2006, inmates informed Lieutenant Tobias Rubio that Mr. Lujan

was going to start some trouble and Mr. Lujan might have a shank.  (Def. Ex. C).  Officer Robert

Kelly searched Mr. Lujan's cell and found sharpened fingernail clippers and a toothbrush that

had been shaved into an operational handcuff key in Mr. Lujan's belongings.  (Def. Ex. C).  On

October 11, 2006, Mr. Lujan received an Advisement of Pending Disciplinary Charges that

charged him with (1) possession of escapee's paraphernalia; (2) possession, introduction or

manufacture of a firearm, knife, or unauthorized sharpened instrument; and (3) possession,

introduction or manufacture of any contraband instrument that is capable of causing death or

serious injury.  (Def. Ex. C).

       17.     On October 13, 2006, Lieutenant Mendoza held the disciplinary hearing.  (Def.

Ex. C).  Mr. Lujan appeared at the disciplinary hearing, but waived representation by a staff

advocate and declined to submit a written statement or to present witnesses or statements in

support of his defense presented at the hearing on his behalf.  (Def. Ex. C).  Mr. Lujan denied

that the handcuff key and the nail clippers belonged to him and asserted that other inmates must

have planted the items in his belongings.  (Tr. at 209, 210).  Lieutenant Mendoza found Mr.

Lujan guilty of (1) Possession of a Sharpened Instrument, (2) Possession of Instrument Used to

Cause Death or Injury, and (3) Possession of Escape Paraphernalia.  (Def. Ex. C).  Mr. Lujan was

sentenced to thirty days in lockdown for each offense, and sixty days probation.  (Def. Ex. C).

       18.     On August 3, 2007, Mr. Lujan and inmate Adrian Hernandez entered inmate

Miguel Garcia's cell without authorization and beat up Miguel Garcia.  (Def. Ex. B).  On August 9, 2007, Mr. Lujan received an Advisement of Pending Disciplinary Charges that charged him with: (1) assault or battery without a weapon; (2) failure to follow a published facility rule that results in damage; (3) attempt to commit any offense; and (4) an act that would be a misdemeanor under state or federal law.  (Def. Ex. B).

19.     On August 11, 2007, Lieutenant Lloyd Burns held a disciplinary hearing.  (Def. Ex. B).  Mr. Lujan denied hitting Mr. Garcia and asked to appear and have witnesses and statements in support of his defense presented at the disciplinary hearing.  (Def. Ex. B).  Mr. Lujan waived representation by a staff advocate.  (Def. Ex. B). Lieutenant Burns did not interview Miguel Garcia or Adrian Hernandez, the officers who filed the reports, or review the videotape of the events.  (Tr. 92-94; 101)  However, Lieutenant Burns would have interviewed witnesses if Mr. Lujan had asked him.  (Tr. 94.)  After reviewing the officers' reports, Lieutenant Burns found Mr. Lujan guilty and sentenced him to thirty days in lockdown and thirty days of loss of privileges. (Def. Ex. B; Tr. 93).  Two months later, on October 11, 2007, Mr. Lujan appealed.  (Def. Ex. B).  After viewing the video clip of the incident, Major Cheryl Roach denied the appeal and affirmed the sanctions.  (Def. Ex. B).

## CONCLUSIONS OF LAW

1.     The FDPA bifurcates the guilt phase of the trial from the sentencing hearing, which is also known as the penalty phase. 18 U.S.C. § 3593(b) (stating that the trial judge "shall conduct a separate sentencing hearing to determine the punishment to be imposed.").  In most cases, the sentencing hearing is conducted before the same jury that determined the defendant's guilt.  *Id*.

2.     The penalty phase consists of a two-stage screening process.  First, during the

8

eligibility stage, the jury must unanimously find beyond a reasonable doubt that the defendant

"intentionally killed the victim" or intentionally engaged in specific conduct that resulted in the

death of the victim.  *See* 18 U.S.C. § 3591(a)(2)(A)-(D).  Additionally, the jury must

unanimously find at least one of sixteen statutorily-prescribed aggravating factors to be present.

*See* 18 U.S.C. § 3592(c)(1)-(16).  If the jury does not unanimously find the requisite intent and

the existence of at least one statutory aggravating factor beyond a reasonable doubt, the death

penalty may not be imposed.  *See id.*

       3.      If both the intent element and at least one statutory aggravating factor are found

by the jury unanimously and beyond a reasonable doubt, then the jury proceeds to the selection

stage of the penalty phase and considers the non-statutory aggravating factors offered by the

United States.  Non-statutory aggravating factors are "any other aggravating factor for which

notice has been given."  18 U.S.C. § 3593(c).  These factors may consist of victim impact

testimony and "any other relevant information." 18 U.S.C. § 3593(a)(2).  Any non-statutory

aggravating factor must be found to exist beyond a reasonable doubt by a unanimous jury.  *See*

18 U.S.C. § 3593(c) & (d).

       4.      During the selection stage, the jury also considers evidence of any mitigating

factor.  *See* 18 U.S.C. § 3592(a).  The FDPA specifies seven mitigating factors, as well as an

eighth category that allows the jury to consider "[o]ther factors in the defendant's background,

record, or character or any other circumstance of the offense that mitigate against imposition of

the death sentence."  18 U.S.C. § 3592(a)(1)-(8). The defendant has the burden of establishing

the existence of a mitigating factor based on "a preponderance of the information."  18 U.S.C. §

3593(c). "A finding with respect to a mitigating factor may be made by 1 or more members of

the jury, and any member of the jury who finds the existence of a mitigating factor may consider

such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established." 18 U.S.C. § 3593(d).

5.     If the jury has determined that at least one aggravating factor exists, the jury must then determine whether all the aggravating factor or factors, both statutory and non-statutory, unanimously found to exist beyond a reasonable doubt outweigh all the mitigating factors found to exist by any individual juror by a preponderance of the information sufficient to justify a sentence of death. *See* 18 U.S.C. § 3593(e). If the jury finds that no mitigating factors exist, the jury must consider whether the aggravating factor or factors alone are sufficient to justify a sentence of death. *See* 18 U.S.C. § 3593(e). Based upon this consideration, a unanimous jury must recommend whether the defendant should be sentenced to death or to life imprisonment without possibility of release. *See* 18 U.S.C. § 3593(e).

6.     In this case, the eligibility stage has been divided from the selection stage of the penalty phase. (Doc. 497). Specifically, the eligibility stage will consist of evidence relevant to Mr. Lujan's mental state and to the existence of one or more statutory aggravating factors. (*Id*.) If Mr. Lujan is found eligible for the death penalty, the matter will proceed to the selection stage of the penalty phase, which will entail evidence relevant to mitigating factors and non-statutory aggravating factors such as future dangerousness. (*Id*.)

7.     The United States wants to offer evidence of the disciplinary incidents in order to prove the non-statutory aggravating factor of future dangerousness. The Supreme Court has recognized future dangerousness as a legitimate non-statutory aggravating factor in capital proceedings. *Simmons v. South Carolina*, 512 U.S. 154, 162-63 (1994). Future dangerousness is defined as evidence that a defendant is "likely to commit criminal acts of violence in the future that would be a threat to the lives and safety of others." *United States v. Bernard*, 299 F.3d 467,

10

482 (5th Cir. 2002).  As a non-statutory aggravating factor, evidence of future dangerousness would be presented in the selection stage of the penalty phase.

       8.      As his first ground in support of this Motion to Suppress Evidence of Disciplinary Actions and Allegations, Mr. Lujan contends that evidence of the events underlying the disciplinary actions should be suppressed because it is unreliable and unsupported by due process.  (Doc. 277).  The United States responds that evidence of unadjudicated conduct is admissible during the penalty phase.

       9.      Mr. Lujan bases his argument on the concept that heightened reliability is required for evidence admitted during the penalty phase of a capital case.  This notion springs from the precept that "in capital cases . . . the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."  *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  Due to the "unique nature of the death penalty," the Eighth Amendment demands "heightened reliability . . . in the determination whether the death penalty is appropriate in a particular case."  *Sumner v. Shuman*, 483 U.S. 66, 72 (1987).  As a result, the Supreme Court has recognized that "in capital cases, it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to the imposition of a death sentence."  *Id.*

      10.     The Supreme Court has observed that reliability at sentencing is enhanced by admitting more evidence rather than less, so that the sentencing authority may have a complete picture of the defendant as an individual.  *See Gregg v. Georgia*, 428 U.S. 153, 204 (1976) (stating it is "desirable for the jury to have as much information before it as possible when it makes the sentencing decision.").  It bears underscoring that a judge or jury at a capital

11

sentencing hearing should "not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." *Williams v. New York*, 337 U.S. 241, 247 (1949).

11.     Mr. Lujan cites no authority for the notion that the reliability of capital sentencing information is related to the question of whether a detention center adhered to the requirements of due process in the detention center disciplinary hearings.  To the contrary, controlling authority refutes Mr. Lujan's argument that the alleged lack of due process in the administrative proceedings renders evidence of the underlying conduct unreliable or inadmissible.  The Tenth Circuit has held "evidence of unadjudicated crimes in imposing the death sentence does not violate a [defendant's] due process rights."  *Hatch v. Oklahoma*, 58 F.3d 1447, 1465 (10th Cir. 1995) *overruled in part on unrelated grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n. 1 (10th Cir. 2001) (*en banc*).  Moreover, "a district court can even admit evidence of conduct underlying a criminal charge for which the defendant has already been acquitted without violating the defendant's constitutional rights."  *United States v. Lujan*, 603 F.3d 850, 856 (10th Cir. 2010).

12.     In that the consideration of unadjudicated or acquitted conduct at a capital sentencing hearing does not offend the Constitution, it follows that the consideration of disciplinary incidents is not barred regardless of whether the detention center complied with due process in adjudicating the disciplinary incidents during internal administrative proceedings.  *See, e.g., Lujan*, 603 F.3d at 856.  The United States intends to offer the evidence of the disciplinary incidents to establish Mr. Lujan's future dangerousness.  In other words, the United States seeks to prove that Mr. Lujan engaged in violent conduct that tends to prove he poses a future danger; it does not seek to prove that the detention center found him guilty of that conduct for its own

12

internal disciplinary purposes.  *See, e.g., Lujan*, 603 F.3d at 856.  The use of the disciplinary incidents at sentencing does not implicate the question of whether the detention center adhered to the strictures of due process in adjudicating the administrative proceedings.

13.    In any event, Mr. Lujan's disciplinary proceedings complied with the requirements of due process.  In a prison disciplinary hearing, the Supreme Court has held that the minimal procedural safeguards afforded by the Due Process Clause are: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action."  *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454, 1985); *see also Mitchell v. Maynard,* 80 F.3d 1433, 1445 (10th Cir. 1996).  DACDC complied with these three requirements in the disciplinary proceedings against Mr. Lujan and the disciplinary determinations were supported by evidence of record.  Thus, even if the degree of process was relevant to the reliability or admissibility of the evidence, Mr. Lujan has not shown that he was denied due process.  Mr. Lujan has presented nothing that would cast doubt on the reliability of the evidence of the events underlying the disciplinary actions.  There is no legal basis to suppress such evidence based on the degree of process afforded at the disciplinary hearings.

14.    As his second ground in support of his motion to suppress, Mr. Lujan asserts that the disciplinary reports should be excluded pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004).  The United States responds that the Confrontation Clause does not apply to the penalty phase and, if it does apply, the Confrontation Clause would apply only to out-of court statements related to the eligibility factors.

15.    *Crawford* held that out-of-court statements that are testimonial in nature are

inadmissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross examine the witness. *Crawford*, 541 U.S. at 54. Notably, *Crawford* covers only out-of-court testimonial statements contained in the disciplinary reports. *Id.* Thus, even if it were applicable to the entire penalty phase, *Crawford* would not apply to the live testimony of witnesses to the incidents.

16.     Additionally, "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding." *United States v. Barrett*, 496 F.3d 1079, 1100 (10th Cir. 2007) (*quoting United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) and *citing United States v. Brown*, 441 F.3d 1330, 1361 n. 12 (11th Cir. 2006)). While the Tenth Circuit has observed that "*Crawford* . . . does not speak to whether it is appropriate for a court to rely on hearsay statements at a sentencing hearing," *United States v. Bustamante*, 454 F.3d 1200, 1202 (10th Cir. 2006), it has not decided whether the Confrontation Clause applies during the penalty phase of a capital case. At least one district court within the Tenth Circuit has held that "the Confrontation Clause is applicable at both the eligibility phase and at least a portion of the selection phase." *United States v. Concepcion Sablan*, 555 F.Supp.2d 1205, 1221 (D. Colo. 2007) (Daniels, J.). However, unlike the case at hand, Judge Daniels declined to sever the eligibility stage from the selection stage. *Id.*

17.     In November 2008, this Court recognized that "a trifurcated proceeding allows the court not only to avoid the admission of prejudicial evidence before the eligibility decision, but also to delineate clearly between the applications of the Confrontation Clause in the eligibility and selection phases." (Doc. 497). The decision to trifurcate the trial was based, in part, on *Ring v. Arizona*, 536 U.S. 584 (2002), which held that facts rendering a defendant eligible for the death penalty must be found by the jury. *Id.* Although *Ring* extended the reach of the Sixth

14

Amendment to the selection stage, it did not extend its reach to the eligibility stage.  *See* John G.

Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 Colum. L.

Rev. 1967, 1997-1999 (2005).   Facts related to the selection decision of whether to impose the

death penalty on an individual defendant call for the more inclusive standard applicable to non-

capital sentencing decisions.  *Id.*  In light of the disparate applications of the Sixth Amendment

arising from *Ring*, this Court divided the penalty phase of this matter into an eligibility stage and

a selection stage.

        18.     This distinction was recognized by the Fifth Circuit in *United States v. Field*s, 483

F.3d 313 (5th Cir. 2007), a case involving future dangerousness.  In *Field*s, the Fifth Circuit held

that the Confrontation Clause did not bar admission of hearsay statements relevant to the

selection determination.  *Field*s, 483 F.3d at 335.  After reviewing Supreme Court jurisprudence

concerning capital sentencing, the Fifth Circuit observed "[n]either the text of the Sixth

Amendment nor the history of murder trials supports the extension of the Confrontation Clause to

testimony relevant only to penalty selection in a capital case."  *Id*.  Although it is not binding,

this Court finds the reasoning of the Fifth Circuit in *Fields* to be persuasive and consistent with

this Court's prior ruling regarding bifurcation of the penalty phase.

        19.     If the penalty phase is reached, the Confrontation Clause would apply in the

eligibility stage due to *Ring*'s requirement that facts necessary to expose Mr. Lujan to a death

sentence must be found by a jury.  *Ring*, 536 U.S. at 609.  If Mr. Lujan is found eligible for

death, the trial would proceed to the selection stage and the general rule allowing hearsay at

sentencing would apply.  *See Williams*, 337 U.S. at 246.  In that the penalty phase has been

bifurcated, testimonial hearsay concerning the disciplinary incidents would be admissible to

prove future dangerousness during the selection stage of the penalty phase, where the Sixth

Amendment does not bar the presentation of testimonial hearsay. *Field*s, 483 F.3d at 335. Thus, the disciplinary reports should not be excluded pursuant to *Crawford*.

20.     As his final ground in support of his Motion to Suppress Evidence of Disciplinary Actions and Allegations, Mr. Lujan maintains that evidence of the disciplinary incidents should be suppressed because the probative value of the evidence is outweighed by the danger of unfair prejudice. The FDPA sets forth a different evidentiary standard for the sentencing hearing than the Federal Rules of Evidence provide at trial. *See* 18 U.S.C. § 3593(c). Thus, "a court has two separate sets of responsibilities with respect to evidence that a single jury may consider twice, once when deciding between guilt and acquittal, the other when deciding between life and death." *United States v. Pepin*, 514 F.3d 193, 207 (2d Cir. 2008). Specifically, during the trial Federal Rule of Evidence 403 governs and "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . . " Fed. R. Evid. 403. However, during the penalty phase, Section 3593(c) governs and:

> Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that *information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.*

18 U.S.C. § 3593(c) (emphasis added).

21.     Section 3593(c) also provides that the Government "may present any information relevant to an aggravating factor for which notice has been provided" and that a defendant "may present any information relevant to a mitigating factor." 18 U.S.C. § 3593(c). Based on § 3593(c), the threshold limitation on introducing information at the sentencing hearing is that such information must be relevant to sentencing. *Lujan*, 603 F.3d at 854. In applying § 3593(c), the Tenth Circuit stated that the standard of Federal Rule of Evidence 401 governs and "information

is admissible at a capital sentencing if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information]." *Lujan*, 603 F.3d at 854 (*quoting* Fed. R. Evid. 401). Undoubtedly, information concerning Mr. Lujan's behavior in an institutional setting is relevant to his future dangerousness in similar circumstances.

22.     In that the information is relevant, § 3593(c) provides that it should be admitted unless "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Section 3593(c) grants the district court greater discretion to exclude unfairly prejudicial or confusing information than the district court has during the guilt phase of the trial. *Lujan*, 603 F.3d at 854. However, the Tenth Circuit has emphasized that "[t]he objective of the sentencing stage of a capital case is to allow the jury a full appraisal of the defendant." *Lujan*, 603 F.3d at 858 (*citing Gregg*, 428 U.S. at 203-04).

23.     Information on the disciplinary incidents has a very high probative value because it tends to make it more probable that Mr. Lujan poses a future danger in a penal setting. *See Kelly v. South Carolina*, 534 U.S. 246, 253 (2002) (stating "evidence of violent behavior in prison can raise a strong implication of 'generalized . . . future dangerousness' "); *United States v. Sampson*, 335 F.Supp.2d 166, 225-26 (D. Mass. 2004) (observing "[p]ast violence by a defendant in prison is relevant evidence that a prosecutor could use to prove future dangerousness . . . ."); *United States v. Grande*, 353 F.Supp.2d 623, 640 (E.D. Va. 2005) (recognizing that "serious assaults on or threats to fellow inmates or correctional staff" would be admitted as to future dangerousness). Because the evidence is strongly probative of future dangerousness, its probative value weighs heavily in favor of its admission. *Lujan*, 603 F.3d at 854.

24.     The high probative value must be balanced against "the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  The Tenth Circuit has observed that "Section 3593(c) permits balancing of probative value against unfair prejudice, not all prejudice."  *Lujan*, 603 F.3d at 858 (internal quotation omitted). There is nothing unfairly prejudicial about evidence of the disciplinary incidents.  "Where the defendant has wide latitude to put on mitigating evidence of his positive characteristics and sympathetic past, there is nothing inherently 'unfair' with allowing the government some latitude to present the unfavorable aspects of the defendant".  *Id*.  The evidence is straightforward and would neither confuse nor mislead the jury.  Balancing of the factors leads to the conclusion that the evidentiary standard of 18 U. S.C. § 3593(c) does not justify suppression of the evidence of the disciplinary incidents.

25.     The use of the disciplinary incidents at sentencing does not implicate the question of whether the detention center adhered to the strictures of due process in adjudicating the administrative proceedings and, in any event, the requirements of due process were satisfied. *Crawford* would not justify suppression of all evidence of the disciplinary incidents and it is inapplicable during the selection stage of the penalty phase.  Finally, the evidentiary standard does not justify suppression of the evidence.

**THEREFORE,**

**IT IS ORDERED** that Mr. Lujan's Motion to Suppress Evidence of Disciplinary Actions and Allegations (Doc. 277), filed on April 30, 2008, is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**