IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                       NO. CR 05-0924 RB

LARRY LUJAN,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Larry Lujan's ("Defendant's") Motion To Disqualify The Office Of The United States Attorney For The District Of New Mexico Based On Prosecutorial Misconduct, filed May 13, 2011. *Doc. 815.* The Court heard testimony and oral argument June 3, 2011. Thereafter, the parties submitted supplemental briefing. *See Docs. 871-1, 872.*

Robert E. Kinney, Supervisory Assistant Federal Public Defender, and Peter Schoenburg, Appointed CJA Counsel, represent Defendant on this motion. The following attorneys participated in the hearing and/or in briefing on behalf of the United States: United States Attorney Kenneth Gonzales; Criminal Division Chief Paula Burnett; and, Assistant United States Attorneys Maria Y. Armijo, Randy Castellano, Jessica Cárdenas Jarvis, Luis Martinez, and Mark Saltman.

Attorney Michael Warbel, a Trial Attorney with the United States Department of Justice Capital Case Unit, also figures into this matter. He entered his appearance in this case on December 2, 2010; and his name appears on subsequent filings with the Court. *See, e.g., Docs. 661, 840.* He did not participate in the hearing or briefing on this matter, however.

The Court has carefully considered the testimony, arguments, and relevant law. Based on

that review, I find that Defendant established only one instance of conduct that is arguably improper – Ms. Armijo's disregard of the Court's firewall protections.  The Court commends firewall counsel Assistant United States Attorney Norman Cairns for his response to the situation, and commends defense counsel for raising the issue of sanctions before trial.  Collectively, their quick responses ensured that Ms. Armijo's actions did not prejudice the defense or jeopardize the upcoming trial.

Although Ms. Armijo's and Mr. Warbel's conduct is inexcusable, in light of the absence of prejudice and an impending lengthy trial, a simple warning will suffice as the appropriate remedy.

## I.  Four Areas Of Alleged Misconduct Defendant Failed To Establish

The defense cites five categories of conduct that it characterizes as prosecutorial misconduct and/or ethical violations.  In general, the five categories are:  (1) government interception of attorney-client phone calls; (2) government intimidation of defense witnesses; (3) government interference with defense efforts to interview witnesses; (4) a government attempt to entrap Mr. Kinney into passing along gang-encoded messages; and, (5) Ms. Armijo's contact with firewall counsel.  *See Doc. 815.*

The testimony and arguments fail to establish any actionable misconduct in the first four areas.  As such, I need not dwell on them, and my analysis focuses on what I consider to be the dispositive factual issues.  For a more thorough background on the parties' positions, I incorporate the motion and initial response herein by reference.  *See Docs. 815, 846.*

### 1.  Interception Of Defendant's Phone Calls To Mr. Schoenburg

The Doña Ana County Detention Center generally records inmate calls, and the United States asked it to provide the FBI with copies of "non-privileged" calls made by Defendant.  *Doc. 846* at 3.  The United States then gave defense counsel a compact disc containing the recordings.  Among

2

them are seven calls Defendant placed to Mr. Schoenburg's office. *See Doc. 815* at 2; *Doc. 815-1* at 1-14. In the written motion, the defense argues that, although "the original interception may have been inadvertent," the prosecutors acted improperly by not informing "defense counsel that the interception of such calls was occurring and did not voluntarily cease obtaining such communications." *Doc. 815* at 15. The motion concludes that "government prosecutors and investigating agents . . . obtained and reviewed confidential attorney-client communications," *Doc. 815* at 17. The defense thus sought an evidentiary hearing as "the only way" to determine if other "attorney-client" calls, conferences or correspondence were "intercepted and listened to" by the FBI and prosecutors. *Doc. 815* at 2.

At the hearing, however, defense counsel took the position that the "issue can be addressed . . . without testimony," and did not introduce any testimony on the subject. *See, e.g., Doc. 861* at 4 (hereinafter "*Hearing Transcript*").

The focus of the defense arguments also shifted. As Mr. Kinney observed, these facts are undisputed: the jail's recording devices automatically recognize certain numbers, such as the Federal Public Defender's Office, as "free calls" that are exempt from recording; the calls in question were initiated by Defendant; the jail's recording system alerted him and the recipient that the call was recorded; Mr. Schoenburg himself knew the calls in question were being monitored and conducted the conversation accordingly; and, none of the recorded conversations contained any confidential "attorney-client business" critical to the defense. *Hearing Transcript* at 5, 6, 8, 9.

The defense theory of improper conduct now rests on (1) the apparent fact that Mr. Schoenburg was unaware he could have requested the jail to include his office number among Defendant's "free calls" and (2) the narrow argument that, once the FBI and prosecutors realized

his office was not a "free call," they had "a duty" to inform the defense that Mr. Schoenburg's calls were being recorded. *Hearing Transcript* at 8.[1]  The defense does not cite any authority that imposes this duty on the government.  Nor do I find anything improper on the part of the government since Mr. Schoenberg and Defendant were aware their conversations were not "secured"/"attorney-client" calls, and no confidences pertaining to the defense were revealed.  *See Doc. 815-1* at 1, 4, 6, 11.[2]

### 2. Intimidation Of Defense Witnesses

Citing the Sixth Amendment right to present witnesses in his own defense, and cases that hold "substantial" government interference with a defense witness decision to testify violates due process, Defendant contends that government agents improperly attempted to intimidate and influence two defense witnesses "to not assist Mr. Lujan." *Doc. 815* at 18; *see also Doc. 815* at 7, 18-19.

Defendant asserts that Ms. Armijo "improperly attempted to intimidate and influence defense witness[]" Corina Cortez, the mother of Defendant's children, by saying Ms. Cortez "should not

---

[1]  In support of his argument that a *per se* violation of the Sixth Amendment occurred and "disqualification is warranted," Defendant's written motion relies exclusively on *Shillinger v. Haworth,* 70 F.3d 1132 (10th Cir. 1995) and *United States v. Horn,* 811 F. Supp. 739 (D.N.H. 1992), *r'd in part on other grounds,* 29 F.3d 754 (1st Cir. 1994).  In both cases, the intentional and illegitimate actions of the prosecutor directly caused the revelation of confidential defense information.  Here, the government was not involved in recording the calls and information recorded was not privileged.  As the United States points out in its response, conversations that do not involve confidential matters or are voluntarily disclosed to third parties, such as via monitored jailhouse phones, are not subject to the attorney-client privilege.  *See Doc. 846* at 11-12 (and authorities cited therein).

[2]  In another call, Defendant had a question about what hygiene items he could take if he was transferred.  Evidently, Mr. Kinney was not available at that time either.  Someone in Mr. Schoenburg's office, who has not been identified as an attorney, answered the question, offered an alternative, and offered to pass along the substance of the conversation to Mr. Kinney.  *See Doc. 815-1* at 13-14.

allow Mr. Lujan to see his children because 'he is a very bad man.'"  *Doc. 815* at 7 (quoting Exhibit D – unsworn declaration of Corina Cortez); *see also Hearing Transcript* at 12, 25, 249 (same exhibit admitted during the hearing as "D1").   At the hearing, however, Ms. Cortez testified that the statement about Defendant being a "bad man" was her ***own*** observation, and Ms. Armijo simply concurred with the assessment.   She further testified that Ms. Armijo's concurrence in no way dissuaded her from the view that she should let Defendant see his children.   Instead, other obstacles accounted for the few visits the children have made to see their father.  *See, e.g., Hearing Transcript* at 27, 29, 30, 35, 37-38, 41-42.

Sophora Davis, an outreach pastor at the Las Cruces Heart of the World Church and religious advisor to Defendant, allowed a female friend of Defendant to have her mail delivered to Ms. Davis' residence.   FBI Special Agent Gary Brotan went to that address intending to talk to this friend and, when Ms. Davis answered the door, she realized he was surprised to find her there instead.  *See, e.g., Hearing Transcript* at 45-48, 59-61.

Agent Brotan's subsequent statements and questions made Ms. Davis feel "acutely uncomfortable," "offended," "embattled," and "not heard," because of what she believed he believed about her.  *See Doc. 815* at 7 (citing Exhibit C – unsworn declaration of Sophora Davis); *Hearing Transcript* at 12, 46, 249 (same exhibit admitted during the hearing as "C1"); *Hearing Transcript* at 48-49 (Ms. Davis' testimony).  Ms. Davis concluded Agent Brotan believed that, because she was associated with Defendant, she either was:  a "criminal;" a "victim of a master manipulator;" "somehow . . . complicit in covering up the location of" the friend and what that friend "was about;" or, trying to "impede what might be a death-sentence case [and] thwart or circumvent the judicial system."  *Hearing Transcript* at 49, 50, 53.

5

On the other hand, Ms. Davis also testified that Agent Brotan's "demeanor" was "appropriate" and his "approach" was "not to be criticized." *Hearing Transcript* at 47. She did not engage him in a debate about their respective views. She did not believe that he realized she was angry with the direction of his comments and questions. They ended their conversations "appropriately," on the part of both of them. *Hearing Transcript* at 47-51.

Ms. Davis specifically testified that Agent Brotan did not try to influence her "to do something" or "not do something," but rather, "to have a different opinion of Mr. Lujan." *Id.* at 54. Though Ms. Davis did not agree with his view that Defendant is a dangerous man, and did not appreciate what she perceived as his attempt to persuade her to change her opinion about Defendant, his views did not influence her in any way. *See Hearing Transcript* at 51, 53, 54, 56, 61-62. Moreover, if the defense were to ask her to testify, and if she had "something to contribute," then she in fact would testify for the defense. *Hearing Transcript* at 58.

Assuming for the sake of argument that these women should be considered defense witnesses, based on the their own testimony, the encounters with Ms. Armijo and Agent Brotan were not "intimidating" and did not deter the women from their opinions or decisions concerning Defendant. Subjectively then, there is no basis for Defendant's motion. Objectively, the government conduct described by the witnesses certainly does not rise to the level of "substantial" interference with a defense witness' decision to testify. *See, e.g., United States v. Smith,* 997 F.2d 674, 680 (10th Cir. 1993) (claim of judge intimidation of witness – "Of course, each case must be viewed in light of the particular circumstances and the specific comments made by the judge."); *United States v. West,* 2010 WL 3951941 (N.D. Ill. 2010) (test is objective).

### 3. *Interference With Defense Efforts To Interview Witnesses*

The defense arguments in this category are somewhat muddled in the written motion and appear to be two-pronged. During the hearing, the defense testimony and arguments focused exclusively on the second prong. Nonetheless, I will briefly address the first prong here as well.

Defendant's first argument suggests that the United States "interfered" by failing to timely disclose witness contact information in violation of Court orders. The defense evidently maintains that the situation is like that in the *Gonzales* case from this district, where Judge Vázquez sanctioned the prosecution for violating court orders and making misrepresentations to the court. *See Doc. 815* at 7-8; *United States v. Gonzales,* 164 F.3d 1285, 1289 (10th Cir. 1999). Defendant bases this argument on the assertion that, in Document 401, the Court ordered the prosecutors to provide "***contact information*** for the ***witnesses*** they interviewed." *See Doc. 815* at 8 (emphasis added). That is too expansive a reading of the Court's order.[3] Even if Defendant's interpretation of Document 401 is accurate, the appeal mooted any effect it had on time lines for disclosures.[4]

---

[3] Historically, the government's deadline in this case for either disclosure of "identities and abodes of witnesses to be called at trial or provide notice of why it should be deferred" was about three months before trial. *See Doc. 293; see also Docs. 250, 349, 779.* During the summer of 2008, the defense filed a motion seeking earlier disclosure of contact information for thirty-one individuals. Included among the names were "Zachary Everett," "Robert (Teddy) Orozco," and "Michael Reeves," who are three of the four witnesses at issue in the present motion. *See Doc. 349* at 2; *Doc. 815* at 21-22. Document 401 filed on August 7, 2008, granted that defense request, but the Court's analysis focused on early disclosure of ***non-testifying*** witnesses. *See Doc. 401* at 5-6. For example, the order noted that "[w]hile the Government ***will disclose witnesses by October 1, 2008,*** not all of the individuals at issue may be on the Government's witness list." *Doc. 401* at 6 (emphasis added). Thus, Document 401 mentions two deadlines, the early disclosure deadline for non-witnesses (August 15, 2008) and the later disclosure deadline for United States witnesses (October 1, 2008). More importantly, Document 401 allowed for the possibility that disclosure would not be made due to security concerns. *Doc. 401* at 7 ("in the event the Government wishes to obtain a protective order relating to the 31 individuals, I would encourage counsel to confer and submit a proposed order [and if] unable to agree on the terms of a protective order, they should notify me.").

[4] Soon after the appeal, the Court set some new deadlines, but not a date for United States' witnesses. *See Doc. 727.* Before the Court did set that deadline, the United States disclosed redacted reports of

Moreover, even if Document 401 remained operational in spirit after the appeal, it did not require disclosure under all circumstances, and clearly contemplated the possibility of non-disclosure for security reasons.  Document 401 expected the parties to arrive at a protective order or ask the Court for help in that situation, which is precisely what happened here after the appeal.[5]  Finally, the *Gonzales* decision offers Defendant no support because here, the prosecutors did not violate a court order or make blatant misrepresentations to the Court about the whereabouts of a witness.[6]

The second argument focuses on the defense team's suspicion that the prosecutors directly admonished witnesses to not speak with them.  Four witnesses are at issue – Joe Black/Cervantes, Zachary Everett, Robert "Teddy" Orozco, and Mike Reeves.  *See Doc. 815* at 8-9, 20-21.  Ms. Armijo, Mr. Saltman, Agent Brotan, and FBI Special Agent Liliana G. McDowell-Schnell traveled to San Antonio in March 2011.  They interviewed the four men, among others.  The defense team then traveled to San Antonio, Texas, in May 2011.  *E.g., Doc. 846* at 7-8; *Hearing Transcript* at 81,

---

recent interviews and a motion asking permission to file a list without the witnesses' addresses for safety reasons.  *See Doc. 846* at 8; *Doc. 779* (filed 4/15/11).  The government's motion acknowledged Document 401 in a footnote, but asserted the security concerns post-dated the order.  *Doc. 779* at 3, n.1; *see also Doc. 779-1* (redacted FBI 302 forms for three interviews dated 10/28/08, 11/19/08, and 1/16/09; these interviews took place after the deadlines associated with Document 401).  Four days after the United States filed its *ex parte* motion, the Court set other deadlines, including that the United States file "an amended witness list no later than May 16, 2011."  *Doc. 784.*

[5]  *See Doc. 815* at 8; *see also Docs. 790, 798, 799, 808, 818, 819; Docket Sheet* (5/16/11 text-only entry not assigned a document number).

[6]  In *Gonzales,* Judge Vázquez issued an order that directed the "government to give defense counsel access to all witnesses under its control or protection" by a "face-to-face encounter" between the witness and defense counsel.  Later, the prosecutor "misrepresented the witness' status" to the court stating: 'She's not under our control. . . . We have nothing to do with her.'"  Even later, though the government clearly "knew the whereabouts of the witness, it failed to give defense counsel access to the witness as ordered."  *Gonzales,* 164 F.3d at 1288.

99-100, 103.[7]

Defense investigator Gilbert Apodaca testified that, on prior trips to San Antonio, the "tenor" of defense team conversations with unspecified "people,"[8] was "more relaxed" in that "[t]hey would at least spend some time with us and talk with us." *Hearing Transcript* at 73. In contrast, during their May 2011 visit, when the defense team approached the four witnesses to speak with them, they were met with somewhat aggressive and hostile "resistance" to those efforts. *E.g., Hearing Transcript* at 80, 82, 83. Mr. Apodaca found that sort of reception unprecedented. *Hearing Transcript* at 90. Given the defense team's earlier experience and that the government team recently interviewed the four and initially resisted giving the defense the addresses for them, the defense team suspected something was amiss. Accordingly, the motion asked the Court to hold an evidentiary hearing "to find out exactly what Ms. Armijo communicated to the various witnesses and when she did so." *Doc. 815* at 9.

The evidence before me utterly fails to bear out the defense's suspicion. The defense acknowledges that witnesses in a criminal prosecution have the "'right to refuse to be interviewed.'" *Doc. 815* at 20 (quoting *United States v. Carrigan,* 804 F.2d 599, 603 (10th Cir. 1986)); *see also Hearing Transcript* at 85-87. The testimony establishes that the prosecutors simply relayed what

---

[7] James Fletcher, who resides in Ohio, is a fifth person sometimes mentioned in connection with these witnesses. As of the date of the hearing, the defense had not yet approached him for an interview. *See, e.g., Doc. 846* at 8; *Hearing Transcript* at 70, 112, 161.

[8] The evidence is contradictory whether the defense spoke with the four witnesses during this prior trip to San Antonio. On cross-examination Mr. Apodaca testified that the defense team had not spoken with them. *Hearing Transcript* at 83. According to Agent McDowell-Schnell, the witnesses said they previously spoke with someone, and the prosecution team concluded the witnesses had to have spoken with the defense team. *Hearing Transcript* at 101. For the reasons above, I find it unnecessary to resolve this factual issue.

both parties agree the law requires.

No one indicated that the government directed these four witnesses to avoid speaking with the defense.  No one indicated that the government even suggested that these four witnesses must not talk to the defense.  *See Doc. 815* at 21.  Rather, as Mr. Apodaca himself related, the witnesses' understanding was that they were not obliged to talk to anyone.[9]

This is entirely consistent with Agent McDowell-Schnell's testimony that during the March 2011 prosecution interviews, the witnesses were advised that "[i]n regards to speaking to the defense and also to us . . . they had the right to speak to them or not to speak to them, just as they had the right to speak to us or not to speak to us; that it was up to them" and that the witnesses even have the choice to "tell us to go pound sand," meaning "tell us to go away, to leave them alone."  *Hearing Transcript* at 101-02.  Each witness was advised they "had the option" of speaking with the defense or prosecution, and the agent did not hear anyone on the prosecution team direct the witness to not speak with the defense.  *Hearing Transcript* at 102-03; *see also Doc. 846* at 8-9; *Hearing Transcript* at 108, 158.  The only witness who even hinted that his cooperation with a defense interview was

---

[9]  The defense team introduced themselves to "four males sitting outside" Zachary Everett's apartment. *Hearing Transcript* at 74.  These gentlemen stated that Mr. Everett was sleeping inside and "'doesn't need to speak to anybody,'" and one stated, "'Oh, yeah, I know about this case.  He doesn't have to talk to you guys.'"  *Hearing Transcript* at 75.  The defense team then encountered Mr. Everett's sister, Blair Dumbrovski.  She told them that she "was told that she didn't have to talk to us" and that she had "nothing to say."  *Hearing Transcript* at 76.  At the Orozco residence, Robert Orozco's mother opened the door and immediately stated:  "'We have the right not to talk to you.'"  *Id.*  At the Reeves residence, Mr. Reeves' brother eventually answered the door and stated:  "he didn't need – he didn't have to talk to us. . . . 'Maria, the female prosecutor, she told me I don't have to talk to you guys.'"  *Hearing Transcript* at 79.  Mr. Cervantes initially told the defense team that "'[t]hey told me not to talk to you,'" and when the defense team "continued to try to speak with him," Mr. Cervantes said:  "'Well, they told me it was optional.'"  *Hearing Transcript* at 81.

somehow linked to a prosecutor, did so as a ruse to dodge speaking with the defense team.[10]

Finally, the defense elicited testimony that FBI 302 forms memorializing the prosecution witness interviews did not record the advisement they were given.  I find that fact inconsequential in light of the consistency between what Agent McDowell-Schnell stated the witnesses were told, and what they relayed to the defense team.  *See Hearing Transcript* at 134-36, 158-60.  Accordingly, I find no improper conduct on the part of the government, no basis to find that the prosecution "interfered" with any of these four witnesses, and certainly no government action that is "'the product of flagrant bad faith.'"  *Doc. 815* at 20 (quoting *Gonzales,* 164 F.3d at 1292).

### 4. *Attempt To Entrap Mr. Kinney*

From a conversation with Ms. Armijo, Mr. Kinney learned that the ***FBI*** "intercepted" a letter from an inmate at another prison intended for Defendant, copied it, and "allowed [it] to be delivered to Mr. Kinney."  *Doc. 815* at 9.  Mr. Kinney thus concluded that "the only reason it was forwarded after interception was to see if defense counsel would deliver what the government believed were gang communications to Mr. Lujan."  *Id.*  Mr. Kinney did not deliver them, and thereby thwarted the "the clear intent" of, *id.,* and "blatant effort" by the government to either "entrap defense counsel into being a conduit for such correspondence without any factual or legal basis for doing so," or

---

[10]  Mr. Orozco's mother informed him of the defense team visit.  He called Mr. Kinney and said:  "'If you have any questions for me, it needs to go through Maria Armijo first.'"  *Hearing Transcript* at 77.  Mr. Kinney relayed that information to Ms. Armijo, requesting that she give permission and to have Mr. Orozco call back, but Mr. Orozco never returned the call.  *See Doc. 815* at 8; *Doc. 846* at 9; *Hearing Transcript* at 78.  Mr. Orozco told Agent McDowell-Schnell that he "felt he was being harassed by the defense," that he told the defense team "that he couldn't speak to them, that he wasn't allowed to speak to them."  *Hearing Transcript* at 106.  "'I just told them that because they were bothering me, to make them leave me alone.'"  *Id; see also Hearing Transcript* at 107 ("Based on his tone of voice and on what he said . . . it seemed like he told them that he wasn't allowed to speak to them as a means . . . to get rid of them, to get them to leave him alone because he just didn't want to talk to them, so he was using that as an excuse.").

"create a conflict of interest that might force the withdrawal of appointed counsel," *Doc. 815* at 22.

The documentary evidence and testimony do not support an inference of improper motive. Instead, they unequivocally establish that the author of the letter is a member of the Barrio Azteca gang, and that the letter was intended for Defendant but addressed to Mr. Kinney.  Under the Southern New Mexico Correctional Facility's procedures, the Security Threat Intelligence Unit at the facility intercepted the letter, and made a copy of it before sending it on to the addressee.  The Unit also forwarded a copy to the FBI Agent in Albuquerque in charge of gang investigations, who eventually sent a copy of the letter on to Agent Brotan, who, in turn, informed Ms. Armijo of the existence of the letter.  Ms. Armijo never received a copy of the letter.  *See Doc. 815-5* at 1-6 (Exhibit E); *Hearing Transcript* at 12, 94-95, 249 (same exhibit admitted during the hearing as "E1 – E5"); *see also Doc. 846* at  9, 19; *Hearing Transcript* at 94-96, 146-153.

Indeed, at the hearing, the defense argument shifted to focus on a "failure to warn" theory. That is, the jail passed along a coded letter that possibly authorized violence against a member of another gang without alerting Mr. Kinney that he was about to receive "presumably volatile and dangerous material;" and the initial FBI agent and Agent Brotan likewise did not warn Mr. Kinney that he may have received the same.  *Hearing Transcript* at 96.  That fact does not convince the Court that there is one shred of evidence of ***entrapment*** on the part of the ***government.***  The prosecutors and Agent Brotan had nothing to do with addressing the letter to Mr. Kinney – the author of the letter did so.  The prosecutors and Agent Brotan had nothing to do with intercepting the letter or forwarding it on to the addressee indicated by the author – the jail security unit and jail policy did so.

12

## II. Government Counsels' Breach Of The Firewall Protections

### 1. Factual Background

Federal Rule of Criminal Procedure 12.2 governs mental health matters pertaining to a defendant.  In late 2007, the government wanted advance notice of whether Defendant would raise any mental health issues at trial or during the penalty phase.  *See, e.g., Doc. 860* at 1, 3 (hereinafter "*Firewall Partial Transcript*").  To avoid a "several-week" delay between the trial and penalty phases, the government wanted to arrange for its own expert to examine Defendant well before trial. *Firewall Partial Transcript* at 28; *see also, e.g., Doc. 228* at 11-12.  Accordingly, Ms. Armijo informed the Court that "there are lots of things that could be done to prevent any sort of risk of "premature [dis]closure to government attorneys;" the government took the position "that we should have firewall attorneys in this case . . . who will basically be the one who is setting . . . up, so that there is no chance of us receiving any information that we are not entitled to prematurely." *Firewall Partial Transcript* at 3, 4; *see also, e.g., Doc. 228* at 12.  She asked the Court to appoint firewall counsel,[11] set a deadline for Defendant's notice, and set out "the procedures that should be followed after that." *Firewall Partial Transcript* at 4.

Mr. Kinney strenuously argued against allowing the government to examine Defendant until after the trial phase concluded.  The defense was very concerned that information would be leaked to the prosecutors even if firewall procedures were in place.  *See, e.g., Firewall Partial Transcript* at 1, 3, 7-13, 16-19; *Doc. 228* at 12.  He cited an instance in a criminal prosecution in this District where a ***government expert*** "disclosed or discussed his evaluation and report with the United States

---

[11]   The parties also sometimes refer to the firewall attorney procedure as a "taint team." *E.g., Firewall Partial Transcript* at 17.

Attorney." *Firewall Partial Transcript* at 17.  Largely because of that experience, he did not "have faith and confidence" in a firewall procedure.  *Firewall Partial Transcript* at 19.

The Court adopted the United States' proposed solution in part in January 2008 in Document 228.  There, the Court:  ordered Defendant to give early notification; agreed that, if such notice was filed, the government would be allowed to conduct its own mental health examination before trial; and, in that event, endorsed the firewall procedure "in order to help ensure that information from any capital sentencing examination will not be leaked, ***even inadvertently,*** to the Government attorneys in this case."  *Doc. 228* at 20 (emphasis added); *see also Doc. 228* at 16-22, 75-76.  The Court declined to rule on specific procedures governing testing and disclosures.  That subject would await Defendant's notice, appointment of a firewall attorney, and time for parties to confer and advise the Court on any such proposed procedures.  *See Doc. 228* at 20-23, 76.

By October 2008, Defendant provided his notice.  *See Doc. 457.*  The parties could not agree on the timing of their respective disclosures to each other.  As such, firewall counsel filed a motion – Document 502 – and briefing on the subject ensued between November 2008 and January 2009. *See Docs. 502, 524, 525, 527, 530, 534.*  Document 502 was not filed with restrictions, so the prosecution team was able to view it.  The motion noted that "Defendant has already been evaluated, examined and tested by an expert for the defense," *Doc. 502* at 2, and suggested procedures governing the government expert's examination and mutual disclosure of the experts' information, *Doc. 502* at 2-4.

Despite certain areas of disagreement, two areas of agreement between firewall counsel and the defense are clear from the motion.  First, firewall counsel and his assistant would take the utmost

care that no information was released to the prosecution team.[12]  Second, regardless of when the experts' information was exchanged, the trial team would not receive *any* information until after a guilty verdict *and* the defense team confirmed it would use the expert testimony.[13]

The appeal delayed ruling on the United States' motion or the defense counterproposal. After the appeal concluded, defense and firewall counsel informed the Court that they intended to submit a stipulated order on Document 502.  When an agreement did not materialize, in March 2011, I set Document 502 for hearing.  *See Docs. 729, 734.*  Meanwhile, on February 18, 2011, Mr. Warbel sent Ms. Armijo a long e-mail concerning the status of Rule 12.2 matters.  He specifically referenced the Court's order Document 228, and the briefing on Document 502.

Mr. Warbel's e-mail opens with the view that the Court's ruling in Document 228 foreclosed Ms. Armijo from "further debat[ing] whether the trial team has a right to know the *defense* neuropsychologist's identity, c.v., or the results of his testing."  *Doc. 871-1* at 9.  Mr. Warbel did, "however, believe that *the trial team should know the identity of the government's expert and whether testing has been completed.*"  *Id.* (emphasis added).  His justification for entitlement to that information was: "[i]t is tough to say" whether "the *trial team can adequately prepare for trial* if

---

[12]  *See Doc. 502* at 1-2 ("All hard copy files will be maintained in a locked file cabinet only available to the above two individuals. Computer generated documents will be password protected with the password shared only by the same two individuals.  Information regarding the evaluation, examination, and any reports and data generated by Government will be maintained securely as set out above.  Likewise, all materials, if any, produced by Defendant, subject to the following requests will be maintained as above.").

[13]  The defense wanted the government to disclose the government expert's information before Defendant's deadline to confirm whether he would be proceeding with any mental health expert testimony during the penalty phase.  Firewall counsel advocated a "simultaneous exchange . . . on a date to be agreed on prior to the beginning of trial."  *Doc. 502* at 4.  Firewall counsel assured that he would "provide protection of the information, so that it would not be released prior to the appropriate time at the penalty phase stage.

it doesn't know such information." *Id.* (same).  Mr. Warbel asked several questions, and it bears

repeating that section of his e-mail in context:

> 1) Did the court give a ruling on the procedures to be followed?  If no, will it?  We want this clarified.
> 2) Is there an agreement between firewall counsel and defense counsel re: procedures?
> 3) Are these procedures filed anywhere?
> 4) Has the government ***identified an expert?  If yes, who?***
> 5) ***Was testing completed.  If yes, when?***
> 6) ***Does firewall have completed test results/expert opinions?***
> 7) Has defendant filed notice re: any additional types of experts?

> This is all material to which the trial team should have access.  It does not run afoul of the court's order, R. 12.2, or applicable caselaw.  We are not getting into statements made during testing, results of testing, or details of testing.  In talking with . . . and another colleague today, we thought that, if the firewall is not confortable sharing anything, it may be a good idea to first engage defense counsel with some of these questions.  To the extent we are unsure whether required procedures have been fully set forth, we may want to look to the court for clarification.  While a firewall is in place, it is ultimately the trial team's responsibility to ensure testing is complete and we are ready for trial.  Obviously, this is something we will want to talk much more about.

*Doc. 871-1* at 10 (emphasis added).

On February 22, 2011, Ms. Armijo replied to Mr. Warbel and asked whether "[i]t is okay"

if she passed along Mr. Warbel's e-mail to then-firewall counsel Howard Thomas and his

supervisor.  *Doc. 871-1* at 9.  Mr. Warbel responded "sure."  Let's try to talk tomorrow."  *Id.*

On February 25, 2011, Ms. Armijo forwarded Mr. Warbel's e-mail, without substantive

comment, to firewall counsel Thomas.  She copied Mr. Warbel, Civil Division Chief Michael Hoses,

Las Cruces Deputy Branch Chief Alfred Perez, and Assistant United States Attorney Saltman on the

same.  *Doc. 871-1* at 11.  As Ms. Armijo testified, Mr. Thomas never responded to her.  *E.g.,*

*Hearing Transcript* at 193-94, 236.

Soon thereafter, First Assistant United States Attorney Steven Yarbrough became involved

with Ms. Armijo's "12.2 issue" because Mr. Thomas was "swamped" and needed to be replaced. *See Doc. 871-1* at 13.  Mr. Yarborough's involvement with the "12.2 issues" evidently was limited to staffing.  Ms. Armijo asked him about substitute counsel because of the Court's upcoming hearing on Document 502.  *See, e.g., Docs. 729, 734; Hearing Transcript* at 194, 218.  Significantly, however, in his March 15, 2011, e-mail to Ms. Burnett, Ms. Crews, Mr. Castellano, Ms. Armijo, and Mr. Saltman, Mr. Yarbrough specifically noted that Defendant had "undergone psychiatric exams,"[14] and that "[w]hoever from our office is dealing with the information ***has to be walled*** off from the trial attorneys who are not yet entitled to that information."  *Doc. 871-1* at 13 (emphasis added); *see also Hearing Transcript* at 194, 218.

    At the end of March, the Court granted the United States' unopposed request to replace Mr. Thomas as firewall attorney with Assistant United States Attorney Jack Burkhead.[15]  On April 1, 2011, the Court entered the stipulated order reached by the defense counsel and Mr. Burkhead concerning the procedures.  Among the rules are that:  (1) firewall counsel's responsibility is to ensure that "[a]ll documents, records, and information disclosed by Defendant to the firewall team and all documents, records, and information obtained from or developed by any expert working with them" is not leaked to the prosecution team or anyone else associated with the U.S. Attorney's office and the case,  *Doc. 746* at 2 (emphasis added); (2) firewall counsel must document any contact it

---

    [14]  In his supplemental brief, Defendant asserts that Mr. Yarbrough's revelation that testing had been conducted "is evidence that the disregard for the firewall procedures was extensive."  *Doc. 872* at 10.  However, the fact that Defendant had already undergone psychiatric testing was a matter of record as of 2008, per Document 502.  The observation explained why coordinated defense and prosecution testing was no longer an issue, and Defendant did not object to that aspect of the motion.  *See Doc. 228* at 221*; Doc. 502* at 2; *see also Docs. 524, 525.*

    [15]  *See Doc. 741* at 1 (motion to withdraw and substitute filed 3/28/11); *Doc. 742* (3/29/11 order granting motion).  Ms. Armijo had no contact with him.  *See, e.g., Hearing Transcript* at 16, 194.

makes with the trial team, *Doc. 746* at 3; and, (3) although the defense will receive copies of the "government's expert's notes of interviews, notes of testing, testing booklets, score sheets, and testing material and videotape," the "government's trial team ***shall not*** receive this material until after Defendant is found guilty ***and*** "has reaffirmed his intention to introduce mental health evidence at the penalty phase of the trial," *Doc. 746* at 5-6 (emphasis added). It is undisputed that the Court's CM/ECF system sent Ms. Armijo and Mr. Warbel electronic notice of my order. *See, e.g., Doc. 746* (notice of electronic filing); *see also Hearing Transcript* at 183, 222-23. Moreover, the stipulated order is not restricted and the docket entry links it directly to Document 502.

By April 6, 2011, Ms. Armijo knew from an e-mail exchange with Mr. Yarborough that Assistant United States Attorney Norman Cairns would be the new firewall counsel. *See Doc. 871-1* at 17. On April 7, 2011, Mr. Cairns filed a "notice" that he was substituted for Mr. Burkhead as firewall counsel. *See Doc. 755.* At some point, Mr. Warbel asked Ms. Armijo to contact Mr. Cairns to "ask . . . certain questions." *Hearing Transcript* at 195. On April 13, 2011, after the Court added Mr. Cairns to the case,[16] Ms. Armijo called him. He informed her that their conversations needed to be recorded, hung up, and immediately notified defense counsel and the Court about what had transpired. *See Hearing Transcript* at 205-06; *see also Doc. 765.* Ms. Armijo and Mr. Cairns followed up that morning with a string of e-mails.[17]

---

[16] Although the document underlying Mr. Cairn's notice is styled as a "motion," it was filed as a "notice." The Clerk accordingly made the substitution, and the Court was not called upon to make a ruling on any motion to substitute him. *See Docket Sheet* entry (dated 4/7/11, entered 4/12/11; "[COURT ONLY] . . . Attorney Norman Cairns for USA added.").

[17] The record is contradictory on this point. According to Ms. Armijo, she sent Mr. Cairns Mr. Warbel's e-mail at Mr. Warbel's request. *See Hearing Transcript* at 195. However, she also did not deny contacting Mr. Cairns by phone. *See Hearing Transcript* at 205. According to the information Mr. Cairns filed with the Court, the call occurred first and then he insisted on e-mail documentation; that is, he asked Ms. Armijo to "to send an email so that there would be a written record of the communication"

Part of the e-mail centers on establishing that Ms. Armijo's initial contact with Mr. Cairns was an innocent mistake because she was unaware the Court had entered the stipulated order and disposed of Document 502.[18]  She also forwarded Mr. Warbel's several-question e-mail to Mr. Cairns, and, in a follow-up e-mail, stated that she was "trying to see where you are on all this stuff" in light of upcoming deadline for pretrial motions.  She asked if they could " 'discuss' via e-mail the parameters of what you believe we can and can't discuss."  Obviously, Ms. Armijo was interested in gaining information albeit in a cautious way.

### 2.  *The Breach Of The Court's Firewall Procedures*

As did Ms. Armijo at the hearing, in its supplemental brief, the United States maintains that she did not engage in any misconduct because she was not seeking information about the specific results of any expert's tests.  It also asserts that, had she read the stipulated order, she would have realized that it contained the answer to most of Mr. Warbel's questions.  *Doc. 871-1* at 4-5.  It suggests in a footnote that Mr. Warbel's concerns were legitimate and that there are "practical" reasons "for why a trial team needs to know the identity of the government's 12.2 expert, such as *Brady/Giglio* and a possible past relationship between the prosecutors and the expert."  *Doc. 871-1*

---

and she did so "[l]ater that morning."  *Doc. 765* at 1, 2.

Mr. Cairns also filed unredacted copies of the e-mails he and Ms. Armijo exchanged.  *See Docs. 765-1 - 765-3* (duplicative unredacted copies of e-mails).  Although his filing is titled as "sealed" and the chosen filing designation was "*ex parte,*" the notice of electronic filing shows the filing was distributed to United States Attorney and Department of Justice recipients.  Ms. Armijo and Mr. Warbel are listed among them.  However, defense counsel were not selected to receive service of Mr. Cairn's sealed notice or unredacted e-mails, and the United States' response to Defendant's motion contains a redacted version of the e-mails.  *See Doc. 765* (notice of electronic filing); *Doc. 846-2* at 2-3.  During the hearing, the United States provided the Court an unredacted copy.  As such, I was able to clarify certain matters in the presence of defense counsel.  *See Doc. 846-2* at 2; *Hearing Transcript* at 200, 240-41.

[18]  For example, she asked him to tell her if there was a Court order "out there that" applied to her concerning "our conversations and contact."  She assumed she would be "allowed to see" such an order, but did not "think [she] had seen" one.

at 5, n.3.  In retrospect, the United States "clearly recognizes" that "the better course would have been to discuss this with defense counsel and then raise it with the Court as necessary."  *Id.*

Rather than excuse the behavior, these points highlight precisely why this Court characterizes the conduct at issue as "inappropriate."  I need not conclude whether Ms. Armijo's behavior was the product of over zealousness, sloppy practices, or a calculated attempt to obtain information.  Whatever the cause, the conduct is unacceptable to the Court.

Foremost, firewall counsel are capable attorneys who can ask whether the government's expert has a past relationship with someone on the trial team, and who can ascertain whether *Brady/Giglio* issues need to be brought to the Court's attention.  Also, never once in her e-mails to others, or in testimony, did Ms. Armijo endorse Mr. Warbel's concern that the ***trial team*** was "inadequately prepared" for trial if it did not have information pertaining to an issue that may arise during the penalty phase.  Instead, she testified that she was concerned the ***firewall team*** was not prepared for the events that were unfolding quickly after the appeal concluded.  *See, e.g., Hearing Transcript* at 194, 217-20.

That Ms. Armijo (and apparently Mr. Warbel) did not know the Court ruled on Document 502 is, in my view, at the very least, inexplicably negligent.  By the time Ms. Armijo called Mr. Cairns, the stipulated order had been entered for almost two weeks.  There is no question that Ms. Armijo had received the notice of electronic filing.

More than that, as is plain from the earliest hearing and order, this Court endorsed the firewall procedure, precisely, to accommodate the ***United States' efficiency concerns***, so no significant delay would ensue if the case ever reached the point where mental health issues became extant during the penalty phase.  True, to make that accommodation, the defense had to make

decisions about some matters earlier and share them with the government.    However, the compromise never contemplated or gave the trial team the right to any ***advance notice*** of mental health information.  The United States' own motion in Document 502 recognizes this, as do the stipulated procedures eventually entered.  As of January 2008, all counsel knew that a firewall protected the Rule 12.2 information from premature disclosure to the prosecution.  Nonetheless, during the intervening period, Ms. Armijo disregarded the existence of the firewall by repeatedly contacting firewall counsel in casual contravention of the firewall's purpose.

The concept of a "wall" is not difficult to understand!  Those relegated to one side of the wall are forbidden from crossing over the wall or looking on the other side.  With or without an Order in place, seasoned prosecutors surely understand the concept and should tread carefully so as not to put the process at risk.

Had I any inkling that this was not a shared understanding, I would have been much more rudimentary and pedantic in endorsing a "firewall" in Document 228.   But I believe the government's e-mails themselves are ample evidence that we all shared that understanding.  Mr. Warbel himself recognized that firewall counsel might be uncomfortable in answering the questions. Before the stipulated order entered, Ms. Armijo was tentative in forwarding Mr. Warbel's questions, asking him if it was "OK" to pass along his questions.  And, more significantly, Mr. Yarborough's March 15th e-mail, sent after Ms. Armijo was aware of the information Mr. Warbel was seeking and before the stipulated order entered, emphatically warned that the prosecution team must be "walled off" from firewall counsel and are "not yet" entitled to information.

Finally, it seems clear to the Court that the tenor of Mr. Warbel's e-mail was to renegotiate what information was walled off from the trial team.  In 2011, soon after he entered his appearance

21

in this case, Mr. Warbel seemed to believe that only information relating to "defense experts," and not "government experts" was walled off.  He recognized that this distinction might raise the antennae of firewall counsel and that Court clarification might be sought.  Rather than following the prudent course of seeking clarification, he and Ms. Armijo, without bothering to read the Order of the Court, chose to engage firewall counsel.

Therein lies what is inappropriate about their conduct.  While "men must turn square corners when they deal with the Government," *Rock Island, A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920) (Holmes, J.), it is not too much to ask the government to turn square corners when seeking the ultimate penalty.  Ms. Armijo and Mr. Warbel potentially jeopardized this case by acting in obvious disregard of my orders and, at the very least, the spirit of the firewall compromise.  Luckily, others in the United States Attorney's office did not allow anything untoward to occur, no harm came to Defendant or this case, and the Court was able to hear the issue before trial.  Contrary to Defendant's characterization in his supplemental brief, in this posture, the integrity of the judicial process has been preserved, rather than undermined.

### 3. The Remedy

Defendant asks the Court to disqualify the entire office of the United States Attorney for the District of New Mexico, or disqualify Ms. Armijo, or to strike the death penalty.  *See Doc. 872.*  The Tenth Circuit's decision in *Bolden* emphasizes just how rare the instances are where it is appropriate to disqualify counsel.  Disqualification of an ***individual*** attorney with the prosecutor's office itself is a "'drastic measure and a court should hesitate to impose it except where necessary.'"  *Bolden v. United States,* 353 F.3d 870, 875 (10th Cir. 2003) (quoting *Bullock v. Carver,* 910 F. Supp. 551, 559 (D. Utah 1995)); *see also Bolden,* 353 F.3d at 878 (same).  Disqualification of an entire U.S.

Attorney's office warrants even more hesitation and is an extremely rare event.   "[B]ecause disqualifying government attorneys implicates separation of powers issues, the generally accepted remedy is to disqualify 'a specific Assistant United States Attorney . . . , not all the attorneys in' the office." *Bolden,* 353 F.3d at 879 (quoting *Crocker v. Durkin,* 159 F. Supp. 2d 1258, 1284 (D. Kan. 2001)); *Bolden,* 353 F.3d at 875 (same).   The panel members expressly stated that "we are strongly influenced by the fact that we can only rarely—if ever—imagine a scenario in which a district court could properly disqualify an entire United States Attorney's office" and that "disqualifying an entire United States Attorney's office is almost always reversible error regardless of the underlying merits of the case." *Bolden,* 353 F.3d at 875-76.

The cases cited by Defendant in his original motion and in his supplement are wholly distinguishable in kind and degree. *See Docs. 815, 872.*   In my view, Defendant's allegations here are more akin to the aggressive prosecution that the court in *Basciano* found did not warrant disqualification of an entire prosecutor's office.   *See United States v. Basciano,* ___ F. Supp. 2d ___, 2011 WL 114865 at ** 3-4 (E.D.N.Y 2011).[19]   Furthermore, both the *Shillinger* and *Horn* decisions cited in Defendant's original motion specifically require a showing of prejudice before a remedy can be imposed.   *See Shillinger v. Haworth,* 70 F.3d at 1144 ("[A]bsent some prejudicial effect on the

---

[19] In *Basciano,* the defendant asserted the entire U.S. Attorney's office and judge had "sinister prosecutorial motives" and were "overly zealous [in] pursuit of the death penalty" because defendant allegedly authored a "hit list" that included as targets names of the Chief of Criminal Division and presiding judge.   The defendant raised "various challenges to the Government's conduct" that court characterized as nothing "more than 'the appropriate interest that members of society have in bringing a defendant to justice with respect to a crime with which he is charged.'"   *Basciano,* 2011 WL at * 4 (quoting *Wright v. United States,* 732 F.2d 1048, 1056 (2nd Cir. 1984), *cert. denied,* 469 U.S. 1106 (1985)).   The instances of allegedly impermissible conduct in that document are similar to the allegations Defendant raises herein.   *See Basciano,* 2011 WL at * 3 (citing a pretrial memorandum by defendant "Docket Entry # 631 at 14–18"); *United States v. Basciano*, 1:05-cr-00050-NGG (Doc. 631 at 14-18, CM/ECF pagination pages 22-26).

[judicial] proceeding" in which the violation occurred, "'there is no basis for imposing a remedy.'")
(quoting *United States v. Morrison,* 449 U.S. 361, 365 (1980); *Horn*, 811 F. Supp. at 752 (D.N.H.
1992) ("The Morrison court noted that the proper approach to a Sixth Amendment violation  is to
'identify and then neutralize the taint by tailoring relief appropriate to the circumstances to assure
the defendant the effective assistance of counsel and a fair trial.'"); *see also Doc. 871-1* at 6-8 (and
authorities cited and discussed therein).

Despite the prosecutors' conduct described above, clearly no prejudice has befallen the
firewall procedures or the defense.  As such, I find none of the remedies Defendant seeks are
justified under the circumstances.  The warning embodied in my remarks at the hearing and in this
decision will suffice.

**IT IS THEREFORE ORDERED** that Defendant's motion to disqualify *(Doc. 815)* is
DENIED.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**