## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**vs.**                                                                    **NO. CR 05-0924 RB**

**LARRY LUJAN,**

       **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's Motion to Stay the Proceedings, Motion for Mistrial, and in the Alternative, Motion to Begin the Jury Selection Process Over; Request for Evidentiary Hearing and Motion for Discovery, (Doc. 956), filed on July 6, 2011. A response is unnecessary. Having considered the motion, the record, relevant law, and being otherwise fully advised, the Court denies this Motion. The request for an evidentiary hearing is denied because Defendant is not entitled to relief as a matter of law.

**I.     Background.**

Mr. Lujan is charged with Kidnapping Resulting in Death of Dana Joe Grauke II, and Aiding and Abetting, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 2. (Doc. 145). The Third Superseding Indictment included a Notice of Special Findings against Mr. Lujan, pursuant to the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3598. (Doc. 145). On July 12, 2007, and February 17, 2011, the United States filed Notices of Intent to Seek a Sentence of Death, pursuant to the requirements of 18 U.S.C. § 3593(a) of the FDPA. (Docs. 146 and 690).

Because counsel were unable to agree to a jury selection plan, the Court fashioned its own and issued the Order Regarding Jury Selection Procedures on April 12, 2011. (Doc. 762).

Pursuant to this Order, the Clerk mailed Juror Qualification Questionnaires and Ability-to-Serve Questionnaires to approximately 2,000 randomly-selected individuals from the Master Jury Wheel for the Southern Division.  (Doc. 762 ).  The Jury Administrator reviewed the responses thereto and excused from jury service those individuals who clearly met the hardship categories set forth in Section 7 of the Jury Selection Plan for the District of New Mexico.  (Doc. 762 ).

On or about April 27, 2011, the Jury Administrator provided counsel with copies of the completed Ability-to-Serve Questionnaires from all venire-persons who requested to be excused, but who were not excused by the Jury Administrator.  (Doc. 762 ). The Order Regarding Jury Selection Procedures required counsel to meet and confer regarding the unresolved hardship requests.  (Doc. 762 ). On or about May 4, 2011, counsel submitted to the Court a stipulated list of those venire-persons they mutually recommended should be excused on the basis of hardship.  The Court excused the venire-persons on this list for hardship.

On May 9, 2011, the Jury Administrator mailed 30-page Substantive Questionnaires to 566 venire-persons, who were qualified and not already excused on the basis of hardship, by either the Jury Administrator or by agreement of the parties.  (Doc. 762 ).  Due to allegations that Defendant is a gang leader, and to preserve their privacy, the Order Regarding Jury Selection Procedures directed that these venire-persons be anonymous.  Accordingly, each Substantive Questionnaire was numbered for this purpose, and the venire persons have been identified by number throughout the jury selection process.  Five hundred and eighteen completed questionnaires were returned.

Venire-persons were instructed to mail the completed Substantive Questionnaires back to the Clerk of the Court by May 18, 2011.  (Doc. 762 ).  Completed Substantive

Questionnaires received after May 25, 2011, were not considered.  (Doc. 762 ).  The Jury Administrator distributed the completed Substantive Questionnaires to counsel and chambers on or about May 27, 2011.  (Doc. 829 ).

The Court ordered counsel to meet and confer regarding strikes for cause; and to submit to the Court a stipulated list of those venire-persons they mutually recommended should be stricken for cause, based solely on questionnaire responses by June 1, 2011. (Doc. 829 ). Counsel failed to comply with this Order.  On June 2, 2011, my law clerk contacted counsel and reminded them that the list had been due the day before.  Counsel responded by e-mail that they were meeting and would submit the list soon.  A copy of this e-mail is attached hereto as Exhibit 1.

At 6:05 p.m. on June 2, 2011, Robert Kinney, one of Defendant's lawyers, e-mailed a list of numbers to chambers and represented that it was the list of potential jurors to be excused by agreement of the parties.  A copy of this e-mail is attached hereto as Exhibit 2.  The purported stipulated list was an attachment in portable document format (.pdf).  A copy of the list is attached hereto as Exhibit 3.  When opened, the attachment was a single-column table of numbers with a title indicating it was a preliminary list.

On June 3, 2011, at approximately 8:15 a.m., my law clerk, who suspected, based on the title of the list, that Mr. Kinney had submitted the wrong list, sent an e-mail to all counsel asking them to submit the stipulated list.  A copy of this e-mail is attached hereto as Exhibit 4. Time was of the essence, as the Jury Administrator needed the stipulated list the day before and a hearing was set on Defendant's Motion to Disqualify the United States Attorney's Office on June 3, 2011, at 9:00 a.m.  Mr. Kinney responded by e-mail that the submitted list was the stipulated list.  A copy of this e-mail is attached hereto as Exhibit 5.

3

Still smarting from an earlier experience, in this same case, wherein Mr. Kinney misrepresented that an order was an agreed order, my law clerk sent another e-mail to counsel and asked for confirmation that the submitted list was indeed the correct list. A copy of this e-mail is attached hereto as Exhibit 6. Mr. Kinney telephoned my law clerk and stated that it was the correct list. Maria Armijo, an attorney representing the government, telephoned my law clerk and stated that Mr. Kinney had e-mailed the correct list. Based on these representations, my law clerk set aside her suspicions and forwarded the list to the Jury Administrator, by e-mail. A copy of this e-mail is attached hereto as Exhibit 7. The Jury Administrator excused the venire-persons on the list and informed the unexcused venire-persons when to report for voir dire.

The venire-persons were scheduled to report in groups of twenty per day, from June 20, 2011, through July 8, 2011. The prospective jurors were scheduled in numerical order according to the randomly, pre-assigned numbers on the Substantive Questionnaires, in order to facilitate voir dire preparation. Starting on June 20, 2011, a daily panel of venire-persons was called in, sworn, and examined. The first day consisted of those juror numbers ranging from 0004 to 0184 who were not previously excused. Due to time constraints, the daily number was dropped from twenty to a lesser number for the remainder of the voir dire process.

On June 20, 2011, the first day of voir dire, Ms. Armijo inquired why some of the daily schedules included prospective jurors that the government had agreed to exclude. The Jury Administrator checked the list that had been provided by Mr. Kinney and confirmed that the numbers Ms. Armijo inquired about were included on the list Mr. Kinney had submitted. Defense counsel then produced a list that differed from the list provided to the Court by Mr. Kinney. A copy of this list is attached hereto as Exhibit 8. At that point, the Jury

4

Administrator and my law clerk realized that Mr. Kinney had provided the wrong list and they immediately informed me of the error.  I ordered counsel to compare the lists and inform me of the extent of the error as soon as possible.

On the afternoon of June 20, 2011, counsel submitted a hand-written list documenting the extent of the havoc wreaked by Mr. Kinney (and not caught by Ms. Armijo).  A copy of this list is attached hereto as Exhibit 9.  To his credit, Mr. Kinney accepted full responsibility for the error in open court on June 21, 2011.

As it turned out, the list submitted by Mr. Kinney, on June 2, 2011, was not only a day late; it was eighty-one jurors short of prospective jurors (the eighty-one) that the government did not agree to excuse.  The list also included contained ten prospective jurors that the government did not agree to include.  Ms. Armijo requested that the eighty-one be called back and the ten erroneously- retained jurors be excused.  The ten jurors were easily excused; the difficult decision was how to remedy the erroneous excusal of the eighty-one.

By that time, it appeared that the voir dire process would result in approximately six jurors passing for cause per day.  With twenty peremptory strikes per side, plus three strikes per side for alternates, sixty-four prospective jurors were needed to seat a jury of twelve jurors and six alternates.  At this rate, I anticipated (correctly, as it turned out) that the process would finish on or about July 6, 2011.  In that the eighty-one would need sufficient notice in order to report back for voir dire, I directed the Jury Administrator to contact the eighty-one and give them the option of reporting on either June 30, July 1, July 5, or July 6, 2011, which corresponded to Days 9, 10, 11, and 12 of voir dire.  A copy of the letter sent to these jurors by the Jury Administrator is attached hereto as Exhibit 10.

These efforts at rectifying the situation were successful.  Fifty-five of the jurors from

5

the eighty-one were rescheduled on June 30, July 1, July 5, or July 6, 2011.  As they responded and opted for one of the four days, the Jury Administrator scheduled them and rescheduled previously-scheduled jurors.  The Jury Administrator filled the entire allotment for each of the four days with fifty-five of the eighty-one.

Voir dire was held for a total of twelve days, between June 20, 2011, and July 6, 2011. On the morning of each day, I read a voir dire orientation statement to the jurors and asked them general questions.  Counsel conducted general voir dire for approximately forty-five minutes for side.  After general voir dire, the panel was placed in the jury deliberation room and prospective jurors were brought back into the courtroom, one by one, for individual voir dire.

As for the order of individual voir dire questioning each day, for the convenience of the jurors, I called the panel members in reverse order of the distance of their residence from the Las Cruces courthouse.  Those who resided the greatest distance away were examined first to allow them to begin their journeys home as soon as possible.  There was no objection to this re-ordering.

A list of prospective jurors scheduled to be examined on Days 1-8 of voir dire, which excluded the eighty-one, (but included another juror taken out of order), is attached hereto as Exhibit 11.[1]  By the end of Day Eight, fifty-one jurors had passed for cause toward the desired group of sixty-four.  A list of prospective jurors who passed for cause on Days 1-8 of voir dire is attached hereto as Exhibit 12.

On June 30, 2011, the first day some of the eighty-one were rescheduled, Defendant

---

[1] On Day 4, Juror 1561 was scheduled and excused.  Defendant has not objected to this juror being called out of numerical order.

moved for a mistrial for violation of the Jury Selection and Service Act (JSSA).  The motion was denied.  That day, fourteen jurors from the eighty-one were scheduled, and seven passed for cause and were retained and seven were eliminated.  On July 1, 2011, the second day involving the eighty-one, defense counsel adopted an approach to general voir dire entirely different from that employed the first nine days.  That approach, unacceptably, encouraged and invited non-service by the venire persons.  The record reflects the nature of the troubling, leading questions posed by defense counsel. The resulting wholesale flight from service was undeniable.  Thus, on July 1, 2011, the defense was successful in having fourteen of the eighty-one eliminated from further consideration for jury service.

On the morning of July 5, 2011, the Court admonished counsel that no questions suggesting that jury service is voluntary or optional depending on the nature and length of the trial would be permitted.  That eliminated the wholesale flight, but did not eliminate further whittling of the eighty-one.  On July 5, 2011, thirteen jurors were scheduled and three passed for cause.  On July 6, 2011, fourteen jurors were scheduled and three passed for cause.  Thus, twenty-one of the eighty-one were eliminated on July 5 and 6, for a total of forty-two eliminated and thirteen retained from the fifty-five jurors examined from the eighty-one.  A list of prospective jurors scheduled to be examined on Days 9-12 of voir dire is attached hereto as Exhibit 13.  A list of prospective jurors who passed for cause on Days 9-12 of voir dire is attached hereto as Exhibit 14.

At the conclusion of Day 11, sixty-one prospective jurors had passed for cause.  At this point, defense counsel suggested that a sufficient number of jurors had passed for cause and the process should proceed to peremptory strikes.  Notwithstanding counsel's suggestions and noting it was too late in the day to notify already scheduled jurors not to travel, the Court

continued the process on Day 12, July 6, 2011, until sixty-four prospective jurors had passed for cause.  At that point, the Court concluded the voir dire process without objection from Defendant.

The Jury Administrator randomized the sixty-four jurors and provided challenge sheets to counsel on July 7, 2011.  Jury selection was held on July 8, 2011.  A jury of twelve jurors and six alternates was selected on July 8, 2011.  Four of the jurors and one of the alternates are from the group of 81.  A list of the jurors and alternates is attached hereto as Exhibit 15.  At jury selection, defense counsel stated his intent to file a petition for a writ of mandamus.  The trial phase is set to commence on July 18, 2011.

## II.    Summary of Arguments.

Defendant moves to stay the proceedings until jury selection is repeated, to bar the seating of any jurors who were brought to court for voir dire out of numerical order, or for a mistrial on the ground that the Jury Department did not call back the eighty-one erroneously-excused prospective jurors in numerical order.  More specifically, Defendant complains that the recalled jurors with identifying numbers higher than 1210 were not incorporated with the non-recalled jurors in numerical order.  Defendant asserts that the Court brought the "government-leaning" jurors back too soon, and therein was the "substantial" deviation.  Defendant contends that between juror number 1 and juror number 1210, there were thirty-seven prospective jurors from the eighty-one, yet forty-nine prospective jurors from this group were called in for voir dire on Days 9-12 (in fact, fifty-five jurors from this group were called in on Days 9-12).  By Defendant's reckoning, twelve too many of the eighty-one were called in for voir dire.  According to Defendant, the Court failed to comply with 28 U.S.C. § 1867(a) and Section 5(b)(9) of the Jury Selection Plan for the District of New Mexico.

8

### III.   Discussion.

The Court followed this District's Jury Selection Plan.  Section 5(b)(9) of the Jury

Selection Plan provides:

> **(9) Source of Jurors for Petit Jury Panels and Grand Jury Panels.**
> The Qualified Jury List will be the source of persons ***who will be drawn
> randomly to report for assignment on petit jury panels*** and on grand jury
> panels.

Jury Selection Plan, Section 5(b)(9) (emphasis added).

Defendant's argument that folding some of the eighty-one jurors back into the

individual ***voir dire*** schedule somehow destroyed the randomness of the ***petit jury panel*** makes

no sense causally or mathematically.

As noted in the chronological factual background above, the prospective jurors were

randomly drawn and assigned numbers in order to preserve their privacy and security for the

duration of this capital case.  In accordance with the Court's Order Regarding Jury Selection

Procedures, the prospective jurors were initially scheduled in numerical order for the sake of

efficiency, to allow counsel and the Court sufficient time to prepare in advance for each day's

individual voir dire.  However, on Day 1 of voir dire, the Court decided to examine the panels

in order of the distance each prospective juror lived from the courthouse.  Thus, from Day 1,

the daily panels were examined out of numerical order without objection from defense counsel.

It was only after the Court announced that the eighty-one were to be rescheduled that

Defendant objected.  As a practical matter, the erroneously-excused prospective jurors required

sufficient notice in order to appear for individual voir dire.  Additionally, it was clear that an

adequate number of prospective jurors would pass for cause by or about Day 12.  For this

reason, the eighty-one were scheduled on Days 9, 10, 11, and 12 of voir dire, which fell on June

30, July 1, July 5, and July 6, 2011.

9

The Court likewise fully complied with 28 U.S.C. § 1867(a).  The Jury Selection and Service Act, 28 U.S.C. § 1861-1878, (JSSA) provides that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.  The purpose of the JSSA is to prevent discrimination, whether it be on account of "race, color, religion, sex, national origin, or economic status."  28 U.S.C. § 1862.

The Seventh Circuit explained the origin and purpose of the JSSA as follows:

> Before the passage of the Jury Selection and Service Act most federal districts
> used the "key man" system, whereby people believed to have extensive contacts
> in the community would suggest names of prospective jurors and the qualified
> jury wheel would be made up from those names.  S.Rep. No. 891, 90th Cong.,
> 1st Sess. 10, U.S. Code Cong. & Admin. News 1968, p. 1792 (1967).  This
> system was believed to foster discrimination, and the Act substituted for it the
> principle of "random selection of juror names from the voter lists of the district
> or division in which court is held," id. at 15, subject to qualifications not
> pertinent here, see 28 U.S.C. § 1863(b)(2).  ***Randomness in a statistical sense
> was not sought, however.***  *See* S.Rep. No. 891, supra, at 16 n. 9; *United States v.
> Bearden*, 659 F.2d 590, 602 (5th Cir. 1981).

*United States v. Gometz*, 730 F.2d 475, 482 (7th Cir.1984) (en banc) (emphasis added).

The JSSA requires that jury selection be random; but it does not define randomness as statistical randomness.  *See United States v. Bearden*, 659 F.2d 590, 602 (5th Cir. 1981).  The JSSA embodies two important general principles: (1) random selection of juror names from the voter lists of the district or division in which court is held, and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only.  *Bearden*, 659 F.2d at 601 (citing 28 U.S.C. § 1867(d)).

By its terms, the JSSA provides remedies for only a "substantial failure to comply" with its requirements for jury selection procedures that are random, objective, and that produce a jury that is a fair-cross section of the community.  28 U.S.C. § 1861 and 1867(d).  "A

10

substantial failure is one that destroys the 'random nature or objectivity of the selection process.' " *United States v. Hemmingson*, 157 F.3d 347, 358 (5th Cir. 1998). "Mere technical deviations from the JSSA's requirements do not violate the JSSA if they do not result in impermissible discrimination in the jury selection process." *United States v. Siegelman*, 640 F.3d 1159, 1188 (11th Cir. 2011).

A JSSA violation is considered "substantial" when it frustrates one of the three principles underlying the Act: (1) random selection of juror names; (2) from a fair cross-section of the community; and (3) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions. *United States v. Carmichael*, 560 F.3d 1270, 1277 (11th Cir. 2009). A litigant need not show prejudice in order to establish a substantial violation of the JSSA. *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir.1977) (overruled on other grounds by the present Fifth Circuit); *United States v. Okiyama*, 521 F.2d 601, 604 (9th Cir. 1975); *United States v. Carmichael*, 467 F.Supp.2d 1282, 1301 (M.D. Ala. 2006).[2]

Defendant's sole argument relates to the first principle – random selection of juror names *for voir dire purposes.* I find this argument devoid of merit.

While the JSSA requires that jury selection be random, it does not define randomness as statistical randomness; nor does it address randomness in terms of voir dire procedures. *See United States v. Bearden*, 659 F.2d 590, 602 (5th Cir. 1981). Instead, the JSSA contemplates random selection of juror names from the voter lists of the district or division in which court is held, followed by determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. *Bearden*, 659 F.2d at 601 (citing 28 U.S.C. § 1867(d)).

_____

[2] Defendant does not raise a fair cross section claim in the instant motion. In 2008, the Court rejected a fair cross section claim raised by Defendant. (Doc. 443).

This is precisely what occurred here.

In the memorandum in support of the instant motion, Defendant cited thirteen cases.  In support of his oral motion for a mistrial in court on June 30, 2011, Defendant cited two cases, one of which was not included in his brief.  These cases and their holdings are summarized in footnote 3.  While I normally eschew long footnotes, the summaries are included herein to illustrate that not one of the cases cited by Defendant stands for the proposition that prospective jurors on a randomly-selected panel must be called in for individual voir dire in any particular order.[3]

---

[3] *See United States v. Hemmingson*, 157 F.3d 347, 358-59 (5th Cir. 1998) (holding there was no violation of the JSSA or of constitutional fair cross-section requirement, equal protection, due process, or right to counsel when an African-American man was tried before an all-white jury, where the method of jury selection was colorblind, despite contention that the court should have summoned all of the veniremen who claimed hardship to the courtroom and ascertained their race before dismissing them); *United States v. Paradies*, 98 F.3d 1266, 1281 (11th Cir. 1996) (holding the district court's sua sponte exclusion of potential jurors for bias, based on jury questionnaires, was not a substantial violation of the JSSA, as the excused jurors either professed that they were prejudiced against one side or described a relationship that the court deemed inappropriate, and exclusions were not directed to any ethnic, racial, or national origin, did not constitute any arbitrary, unreasonable exclusion of discrete segments of the venire, and did not cause the venire to consist of anything other than a fair cross-section of community); *United States v. Calabrese*, 942 F.2d 218, 222-23 (3rd Cir. 1991) (holding that the exclusion of jurors for cause on basis of mere knowledge of defendant violated JSSA, the violation was material, and the proper relief was a new trial); *United States v. Okiyama*, 521 F.2d 601, 604 (9th Cir. 1975) (holding that deficiencies in the process of selecting jurors created serious risks that those selected did not have a sufficient proficiency in English to understand the proceedings and they did not represent a fair cross section of the community and required dismissal of the indictment, despite absence of prejudice); *United States v. Coleman*, 429 F.Supp. 792, 795 (D. Mich 1977) (holding the fact that voter registration lists were unavailable to the court in computer-compatible format did not excuse the failure of the clerk to refill the master jury wheel within a two-year interval, and that an 11-month delay in refilling the wheel constituted a substantial failure to comply with the JSSA); *United States v. Awadallah*, 457 F.Supp.2d 239, (S.D.N.Y. 2006) (finding no JSSA violation where, following affirmation on government's interlocutory appeal of a pretrial evidentiary ruling and recall of previously-selected jury, the unavailability of some jurors from the original panel did not render remaining jurors "volunteers"); *United States v. Manbeck*, 514 F.Supp. 141 (D.S.C. 1981) (holding where the jury wheel contained only 299 names for first drawing and 267 names in second drawing, when the local plan required at least 300 names, was a mere technical violation of the JSSA); *United States v. Clay*,159 F.Supp.2d 1357, 1366 (M.D. Ala. 2001) (holding that the local jury selection plan in which the administrator almost always granted temporary deferrals and then, upon expiration of the deferrals, constructed venire lists in such a way as to prefer the previously-deferred jurors, over those who were drawn directly from the qualified wheel, substantially violated the JSSA provision requiring random selection of names from the district's qualified wheels because the practice

Notably, the one instance I have found where a court noted a JSSA violation would

occur is if a district court "selected all its jurors by randomly drawing names from the qualified

wheel and allowing those selected to opt in or out at will."[4]  This Court did not allow the

eighty-one jurors to "opt out" in this sense.  The eighty-one were summonsed to call the Jury

Department and given the option of appearing on one of four days.  In the event the Court did

not reach the sixty-four goal before they had all been called back, the Court would have

recalled them all out of necessity.  Even stretching the analogy, however, as the Seventh

Circuit, sitting en banc, has explained, "[s]ome voluntarism is . . . implicit in the use of voter

lists, since there is no legal duty in this country to vote."  *United States v. Gometz*, 730 F.2d

---

allowed a disproportionate number of white jurors and created a potential for race discrimination); *United States v. Kennedy*, 548 F.2d 608 (5th Cir. 1977) (reversed on other grounds) (holding that, although the emergency use of volunteer jurors selected from citizens who had just finished a term of jury service violated both the letter and spirit of the JSSA, the defendant had failed to preserve his JSSA objection in a proper manner); *United States v. Hawkins*, 566 F.2d 1006 (5th Cir. 1978) (holding that where the clerk conspired with a federal criminal defendant in an unrelated trial to fix the selection of the jury venire in the unrelated defendant's case, prompting the respective trial judges to exchange venires in order to avoid any possibility of prejudice, the defendant suffered no violation of his constitutional rights by reason of the fact that the pool from which his venire was selected was allegedly "stacked" with the names of people believed by the other defendant to be favorable to him was not a "discernible class"); *United States v. Branscome*, 682 F.2d 484 (4th Cir. 1982) (holding that selection of volunteers to serve on a grand jury from a pool of prospective jurors who had been randomly selected violated JSSA); *In re United States*, 426 F.3d 1 (1st Cir. 2005) (holding that jury selection process adopted by district court in capital murder trial involving African-American defendants, requiring mailing of second-round of summonses to specific geographic areas when juror questionnaires were not returned from those areas, did not comply with JSSA, even though the process created by the district court was developed to address low juror questionnaire return rates in particular zip codes, which resulted in under representation of African-American jurors in jury pool; supplemental draw process created by district court did not give equal odds of selection to every name in master wheel; writ of mandamus was granted.); *Davis v. Warden*, 867 F.2d 1003 (7th Cir. 1989) (holding that the petitioner failed to establish that the under representation of African-Americans on venire was due to systematic exclusion in jury selection process); *United States v. Edwards*, 72 F. Supp. 2d 668 (M.D. La.1999) (cited by Defendant in court in support of motion for mistrial (holding that the failure of the clerk to post a public notice of the selection of a grand jury was merely an isolated oversight and did not constitute a substantial failure to comply with the JSSA).

[4]  *Kennedy*, 548 F.2d at 612; *see also United States v. Branscome*, 682 F.2d 484, 485 (4th Cir. 1982) (holding that use of volunteer jurors introduced an impermissible subjective element into jury selection).

475, 482 (7th Cir. 1984) (en banc).  Thus, that Court held that the JSSA did not "establish a

requirement of randomness so rigorous as to forbid any trace of voluntarism."  *Id.*  Indeed,

"[v]oter lists contain an important built-in screening element in that they eliminate those

individuals who are either unqualified to vote or insufficiently interested in the world about

them to do so."  *Id.*, 730 F.2d at 479.

 Moreover, even where a court does find that jurors volunteered for service, it may

nevertheless hold that there was no "substantial violation" of the JSSA. *United States v.

Ramirez*, 884 F.2d 1524, 1530 (1st Cir.1989).  In *Ramirez*, there were not enough jurors to

reach the necessary venire number.  *Id.*, 884 F.2d at 1527.  The jury clerk went to the "dead"

file, which contained the names of jurors selected at random from the jury wheel who had

served as jurors more than two years prior.  *Id.*  Due to time constraints for augmenting the

venire, the clerk called those selected from the "dead" list on the telephone.  *Id.*  The clerk

asked each one if he/she could serve again as a juror and gave them the date for reporting for

duty.  *Id.*  None of those called were told that they had to serve as a juror.  *Id.* Ten to twelve

persons were added to the venire by this method.  *Id.*  The district court declared a mistrial

without inquiring whether the jurors called on a volunteer basis were on the jury panel.  *Id.*

The First Circuit stated that no substantial violation of the JSSA was evident in the record

because the test "for a substantial violation is whether it either allowed discriminatory selection

of jurors or otherwise prevented jury panels from consisting of fair cross sections of the

community."  *Id.*  (internal quotation marks omitted).  Absent such a showing, the use of

volunteer jurors did not constitute a substantial violation of the JSSA.  *Id.*

 In this case, the voluntariness decisions are inapposite.  The jurors were randomly

drawn for the petit jury panel, in accordance with the Jury Selection Plan and the JSSA. Defendant has not cited, and the Court's research has not found, any authority for the concept that a party has a right to voir dire to proceed in any particular numerical order.  Indeed, the numerical order was not adhered to from the outset, without objection.  Neither the Jury Selection Plan, the JSSA, nor the cases cited by Defendant, support his stance.

**IV.    Conclusion.**

Simply put, Defendant does not have a right to voir dire the prospective jurors in any particular numerical order.  The prospective jurors were selected at random, in compliance with the JSSA and the Jury Selection Plan.  Indeed, there was never any "randomness" compliance reason for the Court to recall the eighty-one jurors.  The Court did so simply as a matter of fairness to try to rectify defense counsel's mistake, which the Court believes was inadvertent. Finally, even though prejudice is not, and was not, a consideration in determining whether the JSSA was violated, I cannot overlook that by eliminating the eighty-one from consideration in the early stages of voir dire, Defendant enjoyed eight out of twelve days of jury selection without having to deal with any of the "government-leaning" eighty-one.  Equity does not favor Defendant. This debacle was a result of defense counsel's error.  There is no prejudice to Defendant and the alleged legal error of which he complains may be appealed in due course. This matter has been pending for six years.  Multiple continuances have been granted.  A jury comprised of citizens able to serve for a period of three months or more has been chosen.  To grant Defendant's request would be to put those jurors on hold, indefinitely, an unreasonable imposition.

15

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Stay the Proceedings, Motion for Mistrial, and in the Alternative, Motion to Begin the Jury Selection Process Over; Request for Evidentiary Hearing and Motion for Discovery, (Doc. 956), filed on July 6, 2011, is **DENIED.**

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**