## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                   **NO. CR 05-0924 RB**

**LARRY LUJAN,**

        **Defendant.**

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's Motion for Production of Voir Dire Transcript in Order for Mr. Lujan to Make out his *Batson* Challenge (Doc. 988), filed July 12, 2011, and on his Amended Motion for In Camera Inspection and to Place Under Seal all Government Notes and Other Jury Selection Material (Doc. 989), filed July 13, 2011. Defendant contends that he needs "expedited" transcripts of all of the voir-dire proceedings and of "the July 8, 2011, hearing of the jury selection, including peremptory challenges, the *Batson* challenge, and the Government's reasons for striking minority jurors" so that "this court [can] make a fair and full assessment of the Government's explanations for using half of its peremptory strikes to remove minority jurors. to ensure that race played no role in jury selection." Doc. 988 at 2-3.

Defendant further contends that "[t]here is a strong basis to suspect that the Government's explanations for strikes was [sic] pretextual, as the grounds given for striking minority jurors also applied to white jurors who were not struck," thus the Court should

> review in camera the Government's jury strike documents to assess whether questionnaires, spreadsheets, and other jury strike documents contain race-based coding. The defense requests disclosure of all documents that "reference race" or any "other language that may be coded for racial significance.

Doc. 989 at 2. Quoting *United States v. Nixon,* 418 U.S. 683, 708-09 (1974), Defendant asserts that

"[w]ithout review of these documents under seal, a judgment that race played no role in the imposition of the death penalty on Mr. Lujan would be, as yet, 'founded on a partial or speculative presentation of the facts.'" Doc. 989 at 3.

The Court concludes that there is no need for a response or for a hearing on the motions. Having fully considered the motions, the record, and the relevant law, and being otherwise fully advised, the Court denies the Motions.

## I.    Procedural and factual background

On July 8, 2011, the parties engaged in the peremptory-challenge portion of jury selection. The Court and the parties anticipated a maximum of fifty-two venirepersons being needed to fill the jury and twelve additional persons needed to fill the six alternate juror spots. Of the first fifty-two venirepersons on the list, according to the Defendant, twenty were self-reported as Hispanic and one was self-reported as African American. As it turned out, only forty-eight venirepersons were needed to fill the jury. Thus, in applying a statistical analysis to the Defendant's *Batson* challenges, the Court will consider the actual, rather than the anticipated, pool of venirepersons. The Government and the Defendant each used eighteen of their twenty peremptory strikes in selecting the jury. After the conclusion of the strike process, four of the selected jurors, and three of the six alternate jurors, are Hispanic.

Defendant made his first *Batson* challenge after the Government struck venireperson 488, the only African-American. Defendant argued generally that 488's questionnaire and responses to the voir dire were similar in many undescribed ways to the majority of the venirepersons, and, that fact, when coupled with the fact that he was the only African-American, gives rise to a prima-facie showing of purposeful intent to discriminate based on race. The Court asked the Government to

respond.  The Government stated that 488 indicated that he disfavored the death penalty by indicating a "4" on a scale of 1-10 in question #122; that he was the only one to use language in answering questionnaire #114 indicating he would require a controversial or unique element for imposing the death penalty; and that, in response to the question whether he could follow and apply the death-penalty system, his response was only "I think so."  After hearing the Government's response, the Defendant asked to "supplement" his prima-facie argument and quoted from a partial written transcript of the voir dire related to question #114.  According to the transcript, 488 stated that he agreed that the *law* doesn't require a controversial or unique element, and when asked whether he was capable of just following this system and determining whether the death penalty would be an appropriate penalty, he said, "I think so."  In response to the continuing question whether he could do that without entering his own equation of whether something else needs to be proved, he answered "right, yes, sir."  The Defendant also asked for an opportunity to later supplement his argument with additional reasons to show that the Government's response was pretextual, speculating that 488 would be in the "middle of the road" on death-penalty views in light of venirepersons that the Government would likely be accepting "down the road."  The Court stated that it was not sure that the Defendant had established even a prima-facie showing that the Government used a peremptory strike to intentionally discriminate against 488 on the basis of race, but that if he had, the Government's reason based on 488's placement of "4" on the scale disfavoring the death penalty was not pretextual, and that considering all of the responses and arguments, there was no evidence of purposeful discrimination.

After the Government used its eighth peremptory strike on venireperson 569, who is reportedly Hispanic, the Defendant made a second *Batson* challenge.  By this time, only fourteen

3

venirepersons had been discussed at the hearing; one juror, a Hispanic female, had been chosen; and the Government had passed on a second Hispanic venireperson, whom the Defendant struck.  Ten of the first fourteen venirepersons (over 71%) were Hispanic, and the Government had used five of its eight strikes (62.5%) on Hispanics while the Defendant had used four of his five strikes (80%) on Hispanics.  The Defendant argued that, because the Government had used more than half of its strikes at that point to strike Hispanics, that was evidence of a prima-facie case of impermissible discriminatory intent.  Of course, the same thing could be said about the Defendant's use of peremptory strikes because he had used 80% of his strikes to that point against Hispanics.  Nevertheless, the Court asked the Government to respond to this statistical argument, and the Government did so.  In addition, however, even though the Defendant had not yet raised any other reasons to support a prima-facie case, the Government also volunteered race-neutral reasons for each of its five peremptory strikes for Hispanics.  *See Batson v. Kentucky,* 476 U.S. 79, 97 (1986) ("In deciding whether the defendant has made the requisite [prima-facie] showing, the trial court should consider all relevant circumstances.  For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination.  Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose.")

As to venireperson 823, the Government stated that it struck her because of her degree in social psychology, which could cause her to sympathize with the Defendant's defenses based on his psychological and childhood background, and because she gave what it interpreted as inconsistent death-penalty responses in her questionnaire.  In response, the Defendant argued that 823 had only indicated "no opinion" in the questionnaire regarding the death penalty but that she had indicated

that she could consider the death penalty and would not automatically vote for a life sentence. The Defendant also gave his opinion that 823 seemed to be pro-government because she didn't list various mitigation categories as being important except for impact on the victim's family and friends.

The Government stated it struck venireperson 830 because she generally opposed the death penalty on the questionnaire; had a counseling background and may give extra weight to the psychological testimony in Defendant's case; and because she said she thought life imprisonment without parole was a more severe penalty than death. In response, the Defendant noted that, although 830 said she was generally opposed to the death penalty, she also said she believed in the sanctity of life and listed her opinion as a "6" on the 1-10 scale toward favoring the death penalty in question #121. The Defendant noted that she had given little importance to mitigating factors and said that they should not be considered in determining the imposition of the death penalty, which he interpreted as a pro-government philosophy. Because she indicated that a defendant's remorse, his difficult childhood and drug use had no importance in determining mitigating factors, the Defendant interpreted 830's questionnaire as "replete" with pro-government sentiments that showed the Government's reasons for striking were pretextual.

The Government said it struck venireperson 781 because she indicated that she had no opinion on the death penalty; because she stated that her family would be disappointed if she voted for the death penalty; because the Government was concerned that her retired husband could influence her; and because she had given high importance to whether a defendant showed remorse as a mitigating factor. In response, the Defendant described 781 as "a middle of the roader" who had indicated a pro-government stance regarding the Defendant's childhood and drug use and who

favored the death penalty as a "6" on the scale, stating that it was necessary to punish the crime.

The Government stated that it struck venireperson 1141 because she said that, as a Christian, she would hate to vote for the death penalty; because she indicated in response to question #109 that, to impose the death penalty, she would require a higher burden of proof: guilt with no doubt about the guilt; and because there was some concern that she would not make an individual decision about the death penalty. In response, the Defendant contended these reasons were pretextual because he interpreted her answers as generally favoring the death penalty. For example, he stated that her answer to #109 showed that she probably would also impose the death penalty if she found him to be guilty beyond a reasonable doubt and that she indicated that the death penalty may be necessary if person has committed a murder and is found guilty and may not be able to live in society without putting more people in danger. The Defendant also noted that 1141 indicated in answer #130 that mitigating factors should not be considered regarding the death penalty and said nothing at voir dire that would ameliorate what he interpreted as strong, pro-government sentiments.

The Government stated that it struck venireperson 569 because he had wavered about his ability to sign a verdict form imposing the death penalty; because his questionnaire responses, taken in totality, indicated that he had anti-death-penalty opinions; and because he had raised medical concerns and seemed to be medicated, which raised concerns about his medical conditions. In response, the Defendant asserted his opinions that 569 straddles the middle of the road in his philosophy about the death penalty and that he was equally, if not more pro-government in his mitigation responses.

Although the Defendant argued that some of the Government's reasons for striking were pretextual, quoting from the questionnaires and discussing the venirepersons' responses in voir dire,

the Court noted that the defendant did not make an initial statistical prima facie case of discrimination and, additionally, did not challenge many of the reasons why the Government struck these venirepersons. Thus, the Court saw no reason to require or allow the Government to further respond to the Defendant's arguments regarding pretext.

Specifically, the Court stated that it was not surprising, given the fact that over 71% of the venirepersons discussed by that point in the jury-selection process were Hispanic, that 62% of the Government's strikes had involved Hispanic venirepersons, so the statistical evidence itself did not make a prima-facie showing of purposeful discrimination against Hispanics. The Court also noted that, in the first fourteen venirepersons, the Government had already passed on two Hispanics and that one was chosen as a juror. Thus, the Court totally rejected the Defendant's statistical basis, *which was the only basis it had raised for challenging the Government's strikes*, and the Court did not need to go further in addressing the Government's reasons for the strikes[1]. *See Batson*, 476 U.S. at 97 ("Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors."); *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) ("*Batson v. Kentucky* . . . established [a] three-part process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause. First, a

---

[1] Defendant contends that, once the Government defended its reasons for striking the venirepersons, and the Court made rulings regarding those reasons, the Defendant no longer has a burden to show a prima-facie case of intentional discrimination, citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion), for the proposition that: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." The Court notes that this language is from a plurality opinion and that it also applies only to appellate review of *Batson* decisions, and not to situations like the one at bar, where the Defendant has asked this Court to rule on discovery matters related to his *Batson* challenge made at the July 8, 2011 hearing. *See Texas v. Brown*, 460 U.S. 730, 737 (1983) (noting that language in plurality opinions that has "never been expressly adopted by a majority of this Court" is "not a binding precedent").

defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination") (citations omitted); *Georgia v. McCollum*, 505 U.S. 42, 59 (1992) (holding that, "*if* the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges") (italics added); *cf. J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 144-45 (1994) ("As with race-based *Batson* claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike."). The Defendant cannot reasonably argue that, and the Court rejects his argument, that simply because the Court addressed the Government's reasons for striking the venirepersons, the Defendant automatically satisfied its prima-facie showing such that the Court should now require the Government to produce even more evidence proving that its reasons for striking the venirepersons were race-neutral.

## II.    Discussion.

The Court will again explain to the Defendant why, ***even if he had*** made a prima-facie showing of discrimination, he did not satisfy his burden to demonstrate discriminatory intent. As to the Government's reasons for striking the five Hispanic venirepersons and the Defendant's assertions that they were pretextual, the Court rejected the Defendant's arguments that the venirepersons' answers to the questionnaires proved that they were pro-government. The Court stated that there were135 questions and 100 different factors in the questionnaires that might play into either side's decision to exercise their peremptory challenges. The Court found that many of

the stricken venirepersons were "middle of the road" in their philosophies, but that it was reasonable for the Government to want jurors that were not just "middle of the road" on the death-penalty issue. The Court concluded that, considering all the facts and circumstances, the Government's race-neutral reasons for striking the five venirepersons were credible and not pretextual.

The Defendant made a third statistical *Batson* challenge at the hearing after the twelve jurors had been selected, again arguing that the Government used a "disproportionate number" of its strikes against Hispanics. He also made a conclusory contention that the questionnaires for venirepersons 718, 534, 184 and 863 did not contain responses that distinguish them from non-Hispanic venirepersons that the Government had accepted. But at this point in the proceedings, venireperson 863 had not even been stricken because he was in the group to be considered as alternate jurors. The parties were not allowed to carry over strikes, and were each given three new strikes. Nevertheless, the Defendant argued that, when a party does not use all of its peremptory strikes to "avoid getting" to a minority venireperson, that may be evidence of purposeful discrimination, citing *United States v. Esparza-Gonzales*, 422 F.3d 878, 899 (9th Cir. 2005). The Defendant insists that, by not exercising two of its twenty peremptory strikes, the Government "ensured" that 863 would not be on the jury. I disagree that *Esparza-Gonzales* applies.

> Under the struck jury system, both the exercise of a peremptory strike and the waiver of a strike remove a single, clearly identified juror. If a peremptory strike is used, the striking party directly removes an identifiable juror, and no new juror is seated. Similarly, if a party waives a peremptory strike in the struck jury system, an identifiable juror (the one with the highest juror number) is removed and no new juror is seated.

*Id.* at 902. In the jury-selection system used in this case, the Defendant's and Government's "waivers" of two of their peremptory strikes each did not result in the "removal" of identifiable jurors. The Government had used two strikes immediately before the last juror was chosen, and it

9

was impossible for the Government to know whether the Defendant would pass or strike the last juror because the Defendant still had two strikes available at that point.

As to the conclusory claim of discriminatory purpose based on the venireperson's answers, the Government responded by stating that it had principally stricken both non-Hispanic and Hispanic venirepersons for the same reason - their death-penalty views.

Specifically, the Government explained that it struck 718 because the answers in his questionnaire indicated an anti-death penalty tone; that he repeatedly expressed concerns with the possibility of mistakes; that he seemed unsure of himself; and indicated worry about his family. In response, the Defendant noted that 718 had checked both the boxes stating that he generally favored the death penalty and that he was generally opposed to it, but stated that, if there was no doubt about guilt, then the death penalty would be appropriate. Thus, the Defendant interpreted 718's concern with mistake to be related to whether it had been proven that the defendant had committed the crime, which in Defendant's view, failed to distinguish 718 from other jurors whom the government had accepted.

The Government stated that it struck venireperson 534 because she answered "I don't know" to several death-penalty questions in the questionnaire, showing that, in a private setting with no pressure, she was unable to express her true feelings or sentiments on the death penalty. It also struck her because she said that life in prison without parole or release is more severe than the death penalty. In response, the Defendant believed that 534's questionnaire indicated that she generally favors the death penalty because in response to question #113, which asks whether the death penalty is the only appropriate sentence for an intentional killing that has been established beyond a reasonable doubt and for which the Defendant has no legal excuse or justification, she answered

10

"yes" and said "nobody has the right to take somebody else's life."  Defendant also stated that 534 indicated a pro-government lack of willingness to hear defense mitigation, like the defendant's remorse, his mental problems, and drug use.  Defendant stated that 534 had said very little to really contradict those pro-death penalty feelings in the questionnaire.

After hearing these arguments, the Court asked the Government to further expand on its race-neutral reasons for striking 534 because she had passed during the "for cause" portion of the jury-selection process.  The Government responded that 534 was very middle of the road after the for-cause voir dire, but that because her questionnaire is replete with "I don't know" responses, it troubled the Government that she could not express her feelings or beliefs on questions #76 and #84, and her beliefs about the death penalty in #109, #114, #116, and #122 without being pressured.  The Government also noted that 534 demonstrated a politically liberal bias on question #48, which often tends to go against the death penalty, and that her opinion that life in prison is a more severe punishment than death was a critical response, in the Government's view, that supported its race-neutral reason for striking her.

The Government struck venireperson 184 because it believed him to be very anti-death penalty on the questionnaire and because he stated he would consider the death penalty only after defense counsel posed leading questions.  The Government noted that it had previously moved to strike 184 for cause.  The Government noted that 184 is 78 years old and it had some concerns with him not being informed that he could voluntarily opt out of service on the jury.  In response, the Defendant contends that, because 184 expressed no opinion regarding, or only generally opposed, the death penalty on his questionnaire, and said he believed he could set his feelings aside and that the death penalty was necessary at the hearing, that he was not a strong opponent of the death

penalty.  Defendant also contended that 184 minimized the mitigating factors because he only gave drug use "a little" importance and that he stated he could go with the death penalty.

Even though the Government had not even stricken 863 when the Defendant raised his third *Batson* challenge, the Government explained why striking him would not be indicative of discriminatory intent.  Those reasons included that 863's response to question #113 and his responses to voir-dire questioning at pages 6, 27, 28, and 29 of the transcript of his hearing showed a preference for rehabilitation, reflection, and atonement, which would heavily color his decision-making process in deciding between a life and death sentence.  Although 863 stated that he did not believe his religion prohibits him from voting for the death penalty, the Government worried that his decision might be unduly influenced by his religious beliefs and make him especially sympathetic toward the defendant's troubled childhood as a mitigating factor.  Further, because 863's nephew is addicted to drugs, and he is supportive of that nephew (believing that there's always a chance for him) the Government was concerned that 863 would be sympathetic to an intoxication defense or mitigation.  In response, the Defendant noted that 863 split on #109, checked all three boxes for "generally favor the death penalty," "no opinion either for or against the death penalty" and "generally opposed to the death penalty."  Defendant contended that 863's responses to #126 indicated a basic hostility to the idea of mitigation because he indicated that a defendant's remorse was of a little importance, but an unstable childhood, mental problems, and mental problems had no importance in deciding between life imprisonment or death. He stated that personal circumstances and background should not be taken into account on his questionnaire, and that he would not consider these in making a decision about punishment, writing that, whether rich or poor, happy or sad the criminal makes the choice to kill.  The Defendant contended that these

answers put 863 in a relatively extreme position in the camp of people predisposed towards the death penalty and his questionnaire did not justify a racial-neutral strike.

After hearing the parties' responses to the third *Batson* challenge, the Court stated that the Defendant's continuing *Batson* challenge based on striking a prohibited category of prospective jurors would be again denied. As to the reasons the Government gave for challenging, the Court found them to be credible and confirmed that 184 said during voir dire that he could never vote for the death penalty and that the government moved to strike him at the time, but that the Court had kept him in the pool on the basis of rehabilitation. With regard to 718, the Court expressed its belief that he was an "outlier" by virtue of his young age and ambivalence - that he was "middle of the road." The Government gave some race-neutral reasons for striking the second set of Hispanic venirepersons that the Defendant did not rebut or respond to. Thus, the Court concluded that the Government's race-neutral reasons for striking the second set of venirepersons was not pretextual.

There is no need for an expedited transcript regarding the challenges the Defendant has statistically raised at the July 8, 2011 hearing because the statistics are apparent on the face of the questionnaires and challenge sheets, and the Defendant had, and quoted from, partial transcripts at that hearings[2]. Further, the Court has already ruled on its statistical *Batson* challenge.

As further noted, the Court has already held that the Defendant did not make a statistical prima-facie case regarding the numbers or proportions of Hispanic venirepersons who were stricken, and has already found that the race-neutral reasons the Government gave for striking the Hispanic venirepersons were credible and reasonable because they have a valid basis in accepted trial

---

[2] The Court also notes that, besides the venireperson questionnaires that the Defendant was given, there are detailed clerk's notes in the record regarding the voir-dire hearings and that the Defendant's attorneys, jury consultant, and assistants obviously made detailed notes about the voir-dire hearings.

strategy. The Court has concluded that the Defendant has not shown purposeful discrimination, thus there is no need for expedited transcripts of the hearings that have not yet been transcribed.

Likewise, the Court will not permit the Defendant to go on a fishing expedition into the Government's normally privileged jury-selection materials when the Court has already ruled that the Defendant failed to make a prima-facie showing of intentional discrimination, and even if it had made such a case, that the Government's reasons for striking the venirepersons were credible and not pretextual. This is not a case like *Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003) where the prosecutor "used peremptory strikes to exclude 10 of the 11 African-Americans eligible to serve on the jury," nor has the Defendants suggested that there is any evidence that the Government questioned Hispanic venirepersons differently than it questioned non-Hispanic venirepersons, as it had done in *Miller-El*. The peremptory challenge is, "as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose." *Lewis v. United States*, 146 U.S. 370 (1892) (internal quotation marks omitted). "No party challenging the opposing party's use of a peremptory strike . . . is entitled to an explanation for that strike, much less to have it disallowed, unless and until a prima facie showing of racial discrimination is made." *United States v. Stewart*, 65 F.3d 918 (11th Cir. 1995).

**IT IS ORDERED** that the Defendant's motion for expedited production of voir-dire transcripts (Doc. 988) and his amended motion for an in-camera inspection of the Government's jury-selection documents (Doc. 989) are DENIED.

_____
UNITED STATES DISTRICT JUDGE