IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| vs. | )    NO. CR 05-0924 RB |
| | ) |
| LARRY LUJAN, | ) |
| | ) |
|       Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** came before the Court on Defendant Larry Lujan's Motion to Exclude Unfairly Prejudicial and Irrelevant Information and Request for Evidentiary Hearing, filed August 8, 2011 [Doc. 1118], which he brings under 18 U.S.C. § 3593(c), and the Fifth, Sixth and Eighth Amendments to the United States Constitution. Having considered the submissions and arguments of counsel, the record, and the relevant law, and being otherwise fully advised, the Court concludes that no hearing is needed and that the Motion should be denied.

**I.    Background.**

Defendant attempts to limit the production, at the selection-of-sentencing phase of this trial, of evidence related to the following incidents at the Dona County Detention Center, where Defendant has been incarcerated pending trial. In a January 23, 2010 incident, Defendant

> disobeyed direct orders to give the jail guard [a] broom [that Defendant was using] and stood in front of the jail guard with clenched fists and repeatedly asked the jail guard why the jail guard was disrespecting him. Lujan then told the jail guard that he better call a Sergeant before "shit goes down."

Doc. 733 at 24. On August 25, 2010, Defendant

> and three other inmates followed inmate Jose Morales [] into the showers. A video shows . . . there was punching and kicking. Morales emerged from the shower area with a big, open wound on his left eyebrow[,] . . . a foot print on his

right arm, and scratches and bruises on the back of his head and neck.

*Id.* at 24-25.  In an incident on November 3, 2010,

> a search was conducted of [Defendant's] cell, in response to a report from another inmate that Lujan had a shank.  During the search, Officer Julio Barragan discovered a razor blade stuck in the frame of a window in Lujan's cell.

*Id.* at 25.  The United States intends to present evidence regarding each of these incidents in support of its presentation of non-statutory aggravating factors of Defendant's future dangerousness and low rehabilitative potential.

## II.    Analysis

The threshold determination for admission of information at the sentencing phase of an FDPA trial is whether the information is "relevant to sentencing." *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010); 18 U.S.C. § 3593(c).  Evidence is relevant if it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401; *see also Lujan*, 603 F.3d at 854 ("Although § 3593(c) fails to define 'relevant,' we have interpreted it as 'the same standard used throughout the federal courts under Federal Rule of Evidence 401.'").  Section 3593(c) further provides,

> [a]t the sentencing hearing [in a death-penalty case], information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. . . . Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

Section 3593(c) grants this Court "greater discretion to exclude unfairly prejudicial or confusing information" than the analogous Federal Rules of Evidence provide during the trial phase.

*Lujan*, 603 F.3d at 854.

Defendant first argues that evidence of all three incidents should be excluded because their probative value as to Defendant's future dangerousness *in a prison setting* is outweighed by their unfairly prejudicial effect. Defendant contends that the broom incident is too minor to be relevant to the issue of future dangerousness, and, therefore, that it is "constitutionally irrelevant to whether Mr. Lujan should receive the death penalty." Doc. 1118 at 5. Defendant cites *United States v. Davis*, 912 F. Supp. 938 (E.D. La. 1996), in support of his proposition. In *Davis*, the defendant was a former police officer. At the death-penalty sentencing phase, the government sought to present, as a non-statutory aggravating factor, the fact that the defendant "displayed a pattern of behavior that posed a continuing threat to society by aiding, abetting, and counseling others in their commission of criminal acts, in violation of the public's trust and the public's right to rely on the integrity and legitimacy of the police department to serve and protect its citizens." *Davis*, 912 F. Supp. at 944. In support, the government proposed submitting evidence of his "alleged assistance or promise of assistance to others in the perpetration of possible future crimes," while he was an officer, including incidents "alleg[ing] threatening rhetoric on [the defendant's] behalf." 912 F. Supp. at 944-45. The Court excluded this evidence of pre-conviction conduct, stating that "[t]hreatening words and warped bravado, without affirmative acts, are simply too slippery to weigh as indicators of character; too attenuated to be relevant in deciding life or death; and whatever probative value they might have is far outweighed by the danger of unfair prejudice and confusion of the issues." *Id.* at 945.

Here, in contrast, the Government seeks to present evidence of affirmative acts in which the Defendant, in the prison setting, has actively disobeyed an order and threatened to use

violence against the guards who are assigned to control his conduct. Thus, this evidence is not "too slippery" or "attenuated to be relevant in deciding life or death," and evidence of Defendant's behavior of threatening violence against a jailer in the prison setting is not unfairly prejudicial. *See Davis*, 912 F. Supp. at 948 (noting the fact that evidence of other acts of violence by a defendant "is arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty").

Defendant also quotes from *United States v. Gilbert*, 120 F. Supp. 2d 147, 153 (D. Mass. 2000), for the proposition that, "prior misconduct must at least be a crime, and a grave one at that." Defendant has used this quote out of context. But even if it was used in context, Defendant's behavior of refusing to obey orders to turn over a broom and return to his cell, clenching his fists, making threats of imminent physical harm, and the jailer resorting to calling other guards for assistance would satisfy the elements of the crime of assault on the jailer. The Court concludes that the broom incident is relevant to the issue of Defendant's future dangerousness in a prison setting and low rehabilitative potential. The evidence is straightforward and would neither confuse nor mislead the jury, and its probative value is not outweighed by the danger of creating unfair prejudice.

The Defendant similarly argues that the Morales and razor-blade incidents are not relevant because they occurred in a county jail, as opposed to a federal prison. *See* Doc. 1118 at 6-8. He quotes *United States v. Diaz*, 2007 WL 656831, *23 (N.D. Cal. 2007) (unpublished), in which the court presented its "concerns", which it emphasized, were not "a final ruling," that

> maximum-security prison facilities are equipped to handle the country's most dangerous criminals. It is certainly possible that such protections will be sufficient to neutralize the potential dangerousness of defendants. . . . If, however, the government's incarceration protocols would nullify defendants'

>dangerousness, presentation of this evidence to the jury would not be relevant to the sentencing determination.

*Id.* at 7.  The Court does not share these "concerns."  Violent prisoners have demonstrated time and again new and innovative ways to kill, maim, and injure guards and fellow prisoners, even in maximum-security prisons where protective protocols may exist but may not have been sufficiently or successfully executed.  *See, e.g.*, March 17, 2011 FBI Press Release titled "Hogsett Charges Prison Inmate with First Degree Murder" (announcing that "an inmate of the federal penitentiary, the maximum security component of the Federal Correctional Complex in Terre Haute, was charged with first degree murder following his alleged killing of another inmate on September 14, 2010.  The indictment alleges that Delaney strangled cell mate Teddy L. Turic, then 57, by using a bed sheet to create a ligature."), located at http://www.fbi.gov/indianapolis/press-releases/2011/ip031711.htm; February 2, 2011 KING 5 News Report by Joe Fryer titled  "Good behavior kept prison murder suspect out of maximum security" (reporting murder of corrections officer by inmate serving life in prison without parole in Washington; reporting that inmate "was not under maximum security because of his good behavior behind bars" and that the "state does not like to place inmates like Byron Scherf, who is serving a life sentence with no chance of parole, under permanent maximum security" because "[t]here's a risk if you put an inmate in a segregation unit too long because they can become agitated, annoyed, frustrated and allienated [sic], and they can become violent") located at http://www.king5.com/news/Why-was-prison-murder-suspect-not-under- maximum-security- 115150164.html; George B. Palermo and Mark T. Palermo, "Death by Inmate: Multiple Murder in a Maximum Security Prison" Med Law 1996;15(3):455-66 (stating in the Abstract that "[t]he authors report the killing of two inmates by a third inmate in a maximum security prison in the State of Wisconsin. All

three had been sentenced to life imprisonment for murder, and one was a notorious serial killer."), located at http://www.ncbi.nlm.nih.gov/pubmed/9009597.  And there is no guarantee that, if Defendant were to be sentenced to life in prison, he would always be detained in a maximum-security facility.  *See, e.g.*, January 17, 2010 Denver Post article by Kirk Mitchell titled "Funding crisis keeps some violent inmates in medium security" (reporting that "[t]hree Colorado inmates who should have been housed in higher-security prisons that had no room for them are suspected of killing fellow prisoners recently in separate incidents.") located at http://www.denverpost.com/ci_14208967.

It is clearly relevant to the issues of future dangerousness and low potential for rehabilitation that, in the prison setting, Defendant has taken opportunities to injure other inmates and to alter hygiene items to use as dangerous weapons or tools for escape.  The evidence is straightforward and would neither confuse nor mislead the jury.  The Court concludes that the highly probative value of the evidence regarding violence toward Morales and hiding and altering the razor and the toothbrush to use as dangerous weapons and tools for escape is not outweighed by any alleged danger of creating unfair prejudice.  *See Kelly v. South Carolina*, 534 U.S. 246, 253 (2002) (stating that "evidence of violent behavior in prison can raise a strong implication of 'generalized . . . future dangerousness'").

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Exclude Unfairly Prejudicial and Irrelevant Information and Request for Evidentiary Hearing [Doc. 1118] is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**