IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                       NO. CR 05-0924 RB

LARRY LUJAN,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's Motion for a Mistrial or, in the Alternative, to Strike Testimony of Government Witness Quintana and Request for Debrief Notes of Quintana, (Doc. 1319), filed on September 11, 2011. The Government filed a response in opposition to this Motion on September 26, 2011. (Doc. 1346). Having considered the motion, the record, the relevant law, and being otherwise fully advised, the Court denies this Motion.

**I.     Background.**

Defendant was charged with Kidnapping Resulting in Death of Dana Joe Grauke II, and Aiding and Abetting, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 2. The Third Superseding Indictment included a Notice of Special Findings against Defendant, pursuant to the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3598. On July 12, 2007, and February 17, 2011, the government filed Notices of Intent to Seek a Sentence of Death, pursuant to the requirements of 18 U.S.C. § 3593(a) of the FDPA. The trial phase commenced on July 18, 2011. The jury returned a guilty verdict on August 9, 2011. After the eligibility phase, on August 11, 2011, the jury found Defendant eligible for the death penalty. The sentence-selection phase commenced on August 29, 2011. The Government rested its penalty-selection-phase case on

September 8, 2011. Defendant's penalty-selection-phase case is ongoing.

## II. Summary of Arguments.

Defendant seeks a mistrial based principally on alleged inconsistencies between the trial-phase testimony and direct penalty-phase testimony of Government witness Danny Quintana. In the alternative, Defendant asks the Court to strike all of Mr. Quintana's testimony. Defendant claims that the Government attorneys committed prosecutorial misconduct in failing to correct the proffered testimony and requests any debrief notes generated between August 3, 2011 and September 7, 2011.

When Defendant advised the Court that it wanted to broach the subject of the Chamberino murders with Quintana, the Government attorneys pointed out that they had not presented substantive evidence of the Chamberino murders through Quintana during their case-in-chief, and they expressed surprise at Defendant's decision to open the door to the Chamberino episode during the trial phase. The Court made a specific inquiry of Defendant and his counsel regarding their desire to put the evidence of these inconsistent statements before the jury. Mr. Schoenburg stated that he wanted to impeach Mr. Quintana with his "multiple inconsistent statements." Tr. at 41. The Court excused the jury for an early lunch and allowed Mr. Schoenburg to question Mr. Quintana in a proffer. After the jury returned from lunch, the Court permitted Defendant to question Mr. Quintana with regard to the Chamberino murders in the presence of the jury. Defendant now seeks a mistrial based on the alleged inconsistent statements he brought out primarily during the proffer.

Defendant identifies the inconsistencies in the testimony as follows:

> On August 3, 2011, in his testimony at the guilt/innocence phase of the trial, Quintana stated that Defendant Lujan went to purchase cocaine from the house of Alfredo Gonzales and Juana Olmeda, the victims of the Chamberino homicides, but that Quintana was not present either inside or outside the house when this purchase happened. Trial Transcript Dated August 3, 2011 ("Tr.") at 36-7. Quintana insisted he was not present when Lujan returned to the Gonzales' home and, under the

> Government's theory, murdered Olmeda and Gonzales. *Id.* Quintana also stated that he wasn't present at Defendant Lujan's home later that night, when, according to the Government's theory, Defendant Lujan returned from killing Gonzales and Olmeda. Tr. at 38. Quintana went on to state that he wasn't present, when, according to the Government's theory, Defendant Lujan obtained gasoline with Pablo Renteria and returned to the Gonzales' home. Tr. at 54.
>
> On September 7, 2011, at the sentence selection phase of trial, Quintana completely reversed his story, making numerous statements contradicting his earlier testimony. These later statements go directly to inculpating Defendant Lujan in a double homicide. Quintana stated that, contrary to his earlier testimony, he sat in the car outside Gonzales' and Olmeda's house while Defendant Lujan went in to purchase cocaine, that he went by the house a second time with Defendant Lujan, and that Defendant Lujan went inside because he was angry and returned nervous ten to fifteen minutes later. Quintana further stated that subsequently, at Defendant Lujan's house, he saw Defendant Lujan and Pablo Renteria leave with a gas can.

(Doc. 1319 at 2). What Defendant's counsel does not point out, however, is that (1) the Court had already ruled that testimony regarding the Chamberino murders was not to be presented during the trial phase; (2) knowing that Mr. Quintana was not represented by his own counsel, Defendant's counsel surprised Mr. Quintana and the Government during the trial phase by asking Mr. Quintana questions about the Chamberino murders; (3) the Government had not gone into the Chamberino-murder issue in direct examination of Mr. Quintana; and (4) the jury never heard the proffered testimony on pages 34-38, on which the Defendant principally relies in his motion. *See* Doc. 1159 at 23-29 (sidebar and excusing jury from courtroom); 33-42 (permitting Mr. Schoenburg to make a proffer and Mr. Quintana's proffered testimony); 42 (jury returning to courtroom). Defendant has further construed an ambiguity in Mr. Quintana's August 3 testimony at page 54, which the jury did hear, as an inconsistency.

In the proffer, defense attorney Peter Schoenburg examined Mr. Quintana extensively on discrepancies between what police reports made in March and in August 2005 stated Mr. Quintana had said in 2005 regarding his whereabouts during the murders. During that proffer, Mr. Quintana

stated several times that he was not in or outside the victims' house when Larry and Pablo set fire to it. *See id.* at 35-36 (denying that he ever told Detective Ordoñez that he "had watched from the front of the house where the murders happened, you saw smoke coming out, and then you ran away" and stating: "I never said that [] I went to the house. I never saw smoke, ever. I wasn't there that night. Larry did all that stuff."); *id.* at 36 (agreeing that, when twice asked "were you in the [victims'] house," that he had answered "no"); *id.* at 37 (agreeing that he had always maintained that, when asked "whether you were sitting outside the [victims'] house *when Larry and Pablo went in*," that "I wasn't never there."); *id.* at 37 (stating "yes" in response to Mr. Schoenburg's question "And you kept trying to tell them you weren't there?") but stating, in response to his question "And some of the time, you actually said you were there?" that he did not "remember saying I was there").

The only reference Defendant makes in his motion for mistrial to testimony that the jury heard on August 3rd is to page 54 of the August 3, 2011 Transcript. After the jury returned to the courtroom, on August 3, the Court allowed Mr. Schoenburg to examine Mr. Quintana in front of the jury regarding inconsistent statements Mr. Quintana had made in his March, August, and September 2005 statements to police. In a confusing line of questioning, in which Mr. Schoenburg at times did not allow Mr. Quintana to answer one question before asking another, and at other times asking questions that were not specific in regard to which house Mr. Schoenburg was referring to or what exactly Mr. Quintana witnessed, Mr. Schoenburg focused his examination on Mr. Quintana's September 13, 2005 statements to Detective Ordoñez:

| | |
|---|---|
| Mr. Schoenburg: | (reading from September 13, 2005 transcript of recorded statement) [Det. Ordoñez:] . . . "we have spoken to you on previous occasions. And you have given us information on those previous occasions which has turned out to be false; is that correct?"[Mr. Quintana]: "Yes, sir." |
| Mr. Schoenburg: | Do you recall giving that? |

4

| | |
|---|---|
| Mr. Quintana: | No. |
| Mr. Schoenburg: | Do you recall the question later, down the same page: [Ordoñez]: "Now, you gave us false information on previous occasions because of why? For what reason?" [Mr. Quintana]: "Because I had nothing to do with it, and I didn't want to get in trouble for something I didn't do." [Mr. Schoenburg:] Do you recall that? |
| Mr. Quintana: | Oh, yes. This was true. I had nothing to do with it. |
| Mr. Schoenburg: | But you were giving them different statements about your involvement in Chamberino; right? |
| Mr. Quintana: | I didn't have no involvement in Chamberino. |

. . . .

| | |
|---|---|
| Mr. Schoenburg: | And on that date, then, September 13th, 2005, you told them - told Detective Ordoñez the story that you all went to go buy cocaine at the home in Chamberino where the two people were found murdered; do you recall that? |

. . . .

| | |
|---|---|
| Mr. Quintana: | But I don't think it was that same night, though. |
| Mr. Schoenburg: | Okay. Do you recall ever telling Detective Ordoñez that this didn't happen the same night? And then, do you remember this question and this answer? "That he went with Larry -- did he go inside his house?" "Answer: His house." "Question: Okay. So now you leave Larry's house. You drive from that house to Larry's house." "Answer: Uh-huh," And question: "And you scored soda? "Answer: Yeah, cocaine." Do you remember giving that answer on the bottom of page 24 and the top of page 25? |
| Mr. Quintana: | No, sir. |
| Mr. Schoenburg: | Okay. And then you indicate that you were at the house when Larry decides to go back to the house of Gonzalez and Juana Olmeda, the two people that ended up dead. Do you recall that? |
| Mr. Quintana: | Yes |
| Mr. Schoenburg: | So this time you don't say you were outside. This time you say you stay at Lopez. Is that what you're saying now? |
| Mr. Quintana: | I was there, but we had left. When Larry did all that stuff, I wasn't there at all. . . . what I found out about that was when Larry told me the next day. |
| Mr. Schoenburg: | And when you testified to Detective Ordoñez that Larry and Pablo went to get the gasoline to torch the house with, were you just making that up or is someone -- you didn't see that happen? |
| Mr. Quintana: | I didn't see that happen, no. |

| | |
|---|---|
| Mr. Schoenburg: | So you're saying now that you weren't even at the house when that happened; is that correct? |
| Mr. Quintana: | I wasn't there, no. |
| Mr. Schoenburg: | And then at the top of page 4, you indicate that Larry and Pablo went in and came back running. Do you remember giving them that statement? |
| Mr. Quintana: | No, I never said that. |
| Mr. Schoenburg: | In any case, the police thought you were lying to them on some of these statements; right? |
| Mr. Quintana: | Yes. |

Doc. 1159 at 51-54.  On cross examination, the Government asked:

| | |
|---|---|
| AUSA Saltman: | . . . [Y]ou were with the defendant the night of the double homicide? |
| Mr. Quintana: | Yes. |
| Mr. Saltman: | Were you with the defendant . . . when two people were killed in their home, correct? |
| Mr. Quintana: | Yes. |
| Mr. Saltman: | Were you inside the home when those people were killed? |
| Mr. Quintana: | No. |
| Mr. Saltman: | All right. Did you see those people get killed? |
| Mr. Quintana: | No. |
| . . . | |
| Mr. Saltman: | Did you ever tell [officers] you were present when those murders were committed? |
| Mr. Quintana: | No. |
| . . . . | |
| Mr. Saltman: | All right. Now, defense counsel asked you whether you remember providing statements about 1998, certain statements about 1998 to law enforcement in 2005. Have you had an opportunity recently to look at those statements that you gave six years ago? |
| Mr. Quintana: | I was just going to the computer just to read it. |
| Mr. Saltman: | But you haven't really looked at these statements, have you? |
| Mr. Quintana: | No. |
| Mr. Saltman: | In fact, when you met with Ms. Armijo and I to prepare you for your testimony in this case, we told you specifically not to look at Chamberino; isn't that right? |
| Mr. Quintana: | Yes. |
| . . . . | |
| Mr. Saltman: | So when you say that you don't recall what you told law enforcement in 2005 about the 1998 murders, is that because you just haven't read the reports in a while? |

| | |
|---|---|
| Mr. Quintana: | Yes, probably. I just don't remember much. It's been a long time. |

*Id.* at 64-70.

The Government elicited testimony about what Mr. Quintana knew regarding the Chamberino murders at the September 7, 2011 penalty-phase hearing. *See* Doc. 1323 at 1-47. The prosecutor asked Mr. Quintana about his prior inconsistent statements to police in March, August, and September 2005. *See id.* at 44-45. Mr. Quintana admitted to the prosecutor that he had lied in the first two statements about not being in Lujan's car outside the victims' house before the Chamberino murders "so I don't get myself in trouble." *Id.* at 45. Mr. Schoenburg then vigorously cross-examined Mr. Quintana, prefacing his questioning with the following statement: "And do you remember, when I was asking you about Chamberino, giving this -- these -- this question and this answer, question on page 36, line 23 -- *in front of this jury* just last month, right." *Id.* at 88. Schoenburg proceeded to impeach Mr. Quintana with his statements from pages 36-38 of the proffered testimony - *testimony that the jury had never heard. See id.* at 88-91. Mr. Schoenburg then quoted from page 54 of the August 3 transcript, at which point the jury *had* been present:

| | |
|---|---|
| Mr. Schoenburg: | (Reading) "Question: And when you testified to Detective Ordoñez that Larry and Pablo went to get the gasoline to torch the house with, were you just making that up or is someone -- you didn't see that happen? "Answer: I didn't see that happen, no." "Question: So you're saying now that you weren't even at the house when that happened; is that correct?" "I wasn't there, no." Do you remember testifying in this proceeding? |
| Mr. Quintana: | That was -- that was the first -- that's the first statement I gave them. That's why I went back and I told them that I was there, that's why. |
| Mr. Schoenburg: | Well, Danny, you've just told this jury this morning that you saw Larry and Pablo jump the fence with a can of gas, right? |
| Mr. Quintana: | Yes. |
| Mr. Schoenburg: | And that Larry went first, Pablo handed the gas can over the |

7

| | |
|---|---|
| | fence to him, correct? |
| Mr. Quintana: | Yes. |
| Mr. Schoenburg: | And yet you said less than a month ago that you weren't even at the house when that happened, correct? |
| Mr. Quintana: | I don't remember saying that. |

Doc. 1323 at 92-93. As the record bears out, Mr. Quintana admitted on August 3 during the proffer to having been at *Lujan's* house before Lujan and Pablo left to set fire to the victims' house. *See* Doc. 1159 at 53. Mr. Schoenburg's next question - which was bifurcated, and his previous and follow-up questions, gave rise to an ambiguity regarding which event he was inquiring into - seeing Lujan and Pablo leave Lujan's house or seeing Lujan and Pablo go into the victims' house and set it on fire. *See id.* at 54 ("And then at the top of page 4, you indicate that Larry and Pablo went in and came back running. Do you remember giving them that statement? [Mr. Quintana:] No, I never said that.").

At the September 7 penalty-phase hearing on redirect, the prosecutor addressed and clarified the August 3 ambiguity that Mr. Schoenburg had referred to at page 54 of the August 3 transcript:

| | |
|---|---|
| Mr. Saltman: | Now, just to be clear, were you -- were you at Alfredo's house when -- when Larry and Pablo left Larry's house with the gas can, did you go with them? |
| Mr. Quintana: | No, I didn't. |
| Mr. Saltman: | Did you stay -- where were you? Where did you stay? |
| Mr. Quintana: | In the front patio, under the garage. |

Doc. 1323 at 104-05.

Mr. Schoenburg obtained admission on September 7 of pages 34-39 of the transcript of the *proffered* testimony, as well as page 54 of the trial testimony, on his erroneous assertion to the Court that "it's sworn testimony in this case under oath, I think the jury is entitled to read what he said the last time he talked to them." *See id.* at 96-98.

8

**III.     Discussion.**

As noted above, Defendant cites only to pages 36-38 and 54 of the August 3, 2011 trial transcript as pages containing inconsistencies that the Government had a duty to correct.  *See* Doc. 1319 at 2 .  Defendant now contends, by again erroneously implying that the jury actually heard the August 3 proffered testimony at the time it was proffered, that "[a] mistrial should be declared in this case [or the entirety of Mr. Quintana's testimony should be stricken from the record] because the prosecutors have committed prosecutorial misconduct by failing to correct a witness's perjury" by not bringing out on direct examination "the inconsistencies between Mr. Quintana's August 3rd and September 7th statements."  Doc. 1319 at 3.  As the Defendant notes, "[a] new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury."  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  As demonstrated above, however, Mr. Schoenburg's complaints are primarily centered upon the *proffered* testimony that the jury did *not* hear.[1]  Thus there is no danger that the inconsistent testimony in the proffer could affect the jury's judgment.

As to its duty to correct inconsistencies, the Government attempted to clarify the ambiguity concerning Mr. Quintana's August 3 statements at page 54 of the transcript concerning where he was when Lujan set fire to the victims' house, and also addressed the inconsistencies between the various police statements.  The cases cited by the Defendant refer to the Government's knowing use of perjured testimony.  Defendant has presented nothing to indicate that the Government knowingly elicited or presented perjured testimony.  Defendant, at most, shows inconsistent statements by a witness – a self-described drug addict responding to a series of ambiguous questions relating to a series of statements given many years ago.  Because the jurors were made aware of the possible

---

[1] The proffered testimony, admitted as Defendant's Exhibit OF, is hereby stricken.

9

inconsistencies between the August 3 testimony they actually heard and the September 7 testimony through cross-examination and further clarification, and because they may weigh any inconsistencies in determining Mr. Quintana's credibility, I find that the motion should be denied. *See United States v. Cardinas-Garcia*, 596 F.3d 788, 795 (10th Cir. 2010) (rejecting Defendant's argument that, because government witness "initially lied to the police about the origin of the drugs, and failed to explain at trial why he did so, his testimony was inherently incredible").

**THEREFORE,**

**IT IS HEREBY ORDERED** that Defendant's request for a mistrial or that Mr. Quintana's testimony be stricken, or that the Government produce its "debrief notes," (Doc. 1319), is DENIED.

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**